Peter R. PIEKARSKI, Plaintiff,

v.

HOME OWNERS SAVINGS BANK, F.S.B., f/k/a Western Minnesota Federal Savings and Loan Association, f/k/a Western Minnesota Savings and Loan Association, f/k/a Fergus Falls Savings and Loan Association; Knutson Mortgage Corporation, a Delaware corporation; Home Owners Federal Savings and Loan Association, a federally chartered savings and loan association; and M. Gene Donley, Defendants.

Civ. No. 4–90–661.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 6, 1990.

William P. Luther, Luther, Ballenthin & Carruthers, Minneapolis, Minn., for plaintiff.

Charles A. Mays and Lawrence P. Schaefer, Leonard, Street and Deinard, Minneapolis, Minn., for defendants.

## FINDINGS & ORDER ON DAMAGES

DEVITT, District Judge.

### Introduction

This wrongful termination from employment action, the liability phase of which was decided by the Minnesota State District Court[1], is now before this court for a

---

1. The Hon. Harlan L. Nelson, Seventh Judicial District—Otter Tail County, presiding.

determination of damages.[2]

### Background

Plaintiff Peter R. Piekarski seeks to recover approximately $800,000.00 in damages arising out of defendants' wrongful termination of his employment on January 26, 1988. Prior to being fired, plaintiff served as vice-president in charge of mortgage lending at Home Owners Savings Bank in Fergus Falls, Minnesota.

Plaintiff filed his initial complaint in this action in November, 1988. Trial of the liability issues commenced November 28, 1989 before an advisory jury. The jury returned a verdict on December 7, 1989, finding defendants liable on plaintiff's breach of contract, retaliatory discharge, and intentional interference with contract claims. The state district court issued findings of fact and conclusions of law on February 20, 1990, adopting the advisory jury's verdict in all respects and providing a thoughtful and detailed explanation of the basis for its judgment.[3] In particular, the state district court's conclusions of law read:

> The defendants are liable to the plaintiff and the plaintiff is entitled to receive:
>
> A. From defendants Home Owners, Knutson and Home Owners of Boston, such compensatory damages and such other relief as may be authorized by law.
>
> B. From defendant Donley, such compensatory damages, punitive damages and such other relief as may be authorized by law.

This court is governed by the state court's findings of fact for the purpose of determining damages and attaches a copy hereto as Appendix A. Consequently, this court need not provide a specific description of the facts giving rise to liability, and may instead focus on those facts and arguments particularly relevant to the damages issues.

### Discussion

Plaintiff seeks to recover the following amounts:

| | |
|---|---|
| Wage and fringe benefit loss | $614,290 |
| Loss of opportunity, reputation, and mental distress | 100,000 |
| Punitive damages (against Donley) | 100,000 |

Defendants contend that plaintiff is, at most, entitled to recover $60,487 for his wage and fringe benefit loss. Defendants further argue that plaintiff is not entitled to receive any award for loss of reputation or mental distress or punitive damages.

The court first seeks to determine the time frame within which plaintiff suffered a compensable loss of wages and fringe benefits. Plaintiff argues that he began suffering wage discrimination in 1984 and that he will never be able to earn a living comparable to that which he could have earned had he remained in defendant's employ. Thus, plaintiff seeks to recover for the prospective loss of wages through the year 2012, when plaintiff would reach age 65, and for the prospective loss of fringe benefits through 2031, when plaintiff would reach age 84. Defendants dispute plaintiff's allegation of wage discrimination, and contend that plaintiff is entitled to an award of back pay for the period commencing January 26, 1988, the date plaintiff was terminated, and ending no later than April 27, 1990, the date the Resolution Trust Corporation placed Home–Owners—Boston in conservatorship.

In support of his wage discrimination allegation, plaintiff contrasts his annual

---

**2.** The procedural history of this case is somewhat unusual. Plaintiff originally filed this action in state district court in Otter Tail County, Minnesota. At the conclusion of the liability phase of trial, the case was removed to the United States District Court for the District of Minnesota, then remanded to Otter Tail County. Pursuant to 12 U.S.C. § 1441a(*l*)(1), (3), the action was next removed to the United States District Court for the District of Columbia. For the convenience of parties and witnesses and in the interests of justice, the case was then trans-ferred, under 28 U.S.C. § 1404(a), to the United States District Court for the District of Minnesota.

**3.** State District Judge Nelson afforded this court helpful insight into this case through his extensive 29 page memorandum. It was of substantial assistance in embellishing the cold record and giving the court an understanding of the case not otherwise obtainable.

salary to the salaries of two fellow officers, David Leabo and Jeffrey Vye:

| Year | Piekarski | Leabo | Vye |
|------|-----------|-------|-----|
| 1975 | $11,400 | | $ 8,400 |
| 1976 | 13,200 | $12,000 | 9,800 |
| 1977 | 15,840 | 15,840 | 11,850 |
| 1978 | 17,736 | 17,736 | 13,890 |
| 1979 | 20,000 | 20,000 | 16,083 |
| 1980 | 22,000 | 22,000 | 17,900 |
| 1981 | 24,500 | 25,000 | 20,150 |
| 1982 | 25,970 | 26,500 | 21,442 |
| 1983 | 27,540 | 28,920 | 28,920 |
| 1984 | 28,900 | 31,500 | 35,000 |
| 1985 | 30,900 | 35,400 | 40,000 |
| 1986 | 32,100 | 37,800 | 45,000 |
| 1987 | 33,000 | 39,900 | 46,500 |
| 1988 | | 43,500 | 50,100 |
| 1989 | | 46,200 | 52,800 |

■ Plaintiff directs the court's attention to 1984 and thereafter and attributes his relatively lower salary to retaliatory wage discrimination.[4] Specifically, plaintiff claims that defendant Donley avenged plaintiff's refusal to commit perjury and engage in other improper conduct by holding plaintiff's salary behind that of his fellow officers and obstructing plaintiff's career path.[5]

Concerning defendant Donley's animosity toward plaintiff, the state district court found:

> During and after the matter with Donley's parents, Donley's attitude toward Piekarski began to change. Piekarski simply could not satisfy Donley. Donley himself testified that after January 1983 he became unhappy with Piekarski's work. No mention was made of Piekarski's work prior to that time. * * * Personnel manager, David Leabo, and Jeffrey Vye also noticed that Donley's personal feelings toward Piekarski were affecting his business judgment.

The evidence does not enable this court to assess with mathematical precision the impact of defendant Donley's contempt for plaintiff upon plaintiff's salary from 1984 through 1987. For example, plaintiff failed to address the possibility that at least a portion of Leabo's salary increases resulted because of greater merit and responsibility vis-a-vis plaintiff. On the other hand, this court respects the state district court's determination that, in general, defendants' treatment of plaintiff "during and after the matter with Donley's parents" was tainted with retaliatory disdain and that decisions respecting plaintiff's wage and career path were tarnished. The court finds that plaintiff suffered a compensable loss of wage and career opportunity due to impermissible retaliation beginning in 1984.[6]

■ As noted earlier, plaintiff contends that he will likely suffer loss through the year 2031. Defendants dispute plaintiff's entitlement to front pay and offer three alternative dates for the conclusion of the damages period. First, defendants argue that plaintiff may recover damages only through April, 1988, when plaintiff became employed as a real estate salesperson and

4. The above chart appears to show plaintiff's salary first lagging significantly behind that of Leabo and Vye in 1983. According to plaintiff, this disparity is illusory because plaintiff enjoyed the use of a company car, which plaintiff's fellow officers did not, a fringe benefit plaintiff valued at $150.00 per month.

5. Defendants contend that a two-year statute of limitations bars plaintiff's wage discrimination claim. *See Rice v. Target Stores,* 677 F.Supp. 608, 615–16 (D.Minn.1988). Assuming, without deciding, that a two-year statute of limitations applies, plaintiff's claim for wage discrimination survives under the doctrine of continuing violation. *See Sigurdson v. Isanti County,* 448 N.W.2d 62, 66–67 (Minn.1989); *Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 440–41 n. 11 (Minn.1983).

6. The exact degree to which plaintiff's salary and career opportunities were damaged is un-

clear. Thus, any calculation of damages caused by defendants' retaliatory wage discrimination will be imprecise. This, however, cannot serve to deprive plaintiff of reasonable compensation. *See Equal Employment Opportunity Commission v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 923 (S.D.N.Y.1976); *aff'd.,* 559 F.2d 1203 (2d Cir. 1977); *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977) (the injured party is not to be deprived of adequate compensation where damage caused by defendant's conduct escapes precise determination); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) ("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.").

ceased actively searching for employment in the banking industry.

"Wrongfully discharged claimants must use reasonable efforts to mitigate their damages." *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir. 1988). In this regard, the law requires "an honest, good faith effort." *Id.; citing United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 938 (10th Cir.1979). Claimants normally mitigate damages by seeking comparable, alternative employment. The law does not require, however, that a claimant move from his home to temper the damage caused by a defendant's conduct. *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir.1983). Once a claimant accepts new employment, his right to recover back or front pay does not necessarily terminate. *See McIntosh v. Jones Truck Lines, Inc.*, 767 F.2d 433, 435 (8th Cir.1985); *State by Johnson v. Porter Farms, Inc.*, 382 N.W.2d 543, 550–51 (Minn.Ct.App.1986). A claimant's right to back or front pay terminates only if he (1) accepts employment in a different field (2) with the intention of voluntarily abandoning the pursuit of employment in the career field from which he was wrongfully terminated. *Id.; Hanna v. American Motors Corp.*, 724 F.2d 1300, 1308 (7th Cir.1984); *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984); *Miller v. Marsh*, 766 F.2d 490, 492–93 (11th Cir.1985).

Here, the evidence shows that plaintiff adequately minimized his damages and that plaintiff did not voluntarily enter the real estate sales field in April, 1988 with the intention of abandoning employment in the banking industry. Within three months of being discharged by defendants, plaintiff visited the Fergus Falls Job Service office, placed applications and resumes with four businesses, personally contacted two other businesses, and discussed employment opportunities with others in the Fergus Falls community.[7] These inquiries led to a real estate sales position in April, 1988, which plaintiff still holds today.

Significantly, the court recognizes that Fergus Falls is a small community, and that relatively few career openings in the banking industry exist. The court finds that the lack of comparable job opportunities (as well as plaintiff's need for income), and not plaintiff's personal desire to leave the banking field, caused plaintiff to accept immediately less remunerative employment as a real estate salesperson in April, 1988. Plaintiff remains willing and able to return to a comparable position in the banking industry should one arise. The record reveals, however, that plaintiff effectively exhausted his search for a position similar to that which he held at defendant Home Owners, and that continued, vigorous efforts at locating such a position in the Fergus Falls area would prove futile. Thus, the court finds that plaintiff's right to receive back pay is not limited by his April 18, 1988 employment as a real estate salesperson.

■ Defendants alternatively contend that the damages period must be limited to either one year, the duration of plaintiff's employment contract with Home Owners— Fergus Falls, or through April 27, 1990, when the Resolution Trust Corporation ("RTC") became conservator over defendant Home Owners—Boston. With respect to defendant's first contention, "[t]he measure of damages for breach of an employment contract is the compensation which an employee who has been wrongfully discharged would have received had the contract been carried out according to its terms." *Gilmore v. Control Data Corporation*, 442 N.W.2d 835, 838 (Minn.Ct.App. 1989); *citing Zeller v. Prior Lake Public Schools*, 108 N.W.2d 602, 606 (1961). Here, however, the state district court did not specifically find that plaintiff's employment contract was limited in duration to one year, focusing instead on the numerous oral and written representations of job permanence directed at plaintiff. Further, plaintiff's claim is not grounded exclusively

---

**7.** Plaintiff entered a concentrated three week course in real estate sales in March, 1987. At that time, plaintiff had no firm intention of entering the real estate field, thinking that such training would prove beneficial regardless of whether he landed in the banking or real estate profession.

in contract. The same facts likewise establish that plaintiff was the victim of impermissible retaliatory wage discrimination and discharge. *See Merchant v. American Steamship Co.*, 860 F.2d 204, 210 (6th Cir. 1988) (a retaliatory discharge claim is not grounded exclusively in contract; hence, damages are not limited by contract principles). The court thus rejects defendants' argument that plaintiff's back pay award cannot exceed one year's salary.

■ On April 27, 1990, the RTC began its appointment as Conservator over Home Owners—Boston. Pursuant to federal regulation, the RTC has the authority to repudiate the employment contracts of officers employed by institutions under conservatorship. 12 C.F.R. § 563.39(b)(5); *see Rush v. Federal Deposit Insurance Corporation*, 747 F.Supp. 575, 577 (N.D.Cal.1990) ("all obligations under employment contracts between FSLIC insured institution and its employees are terminated by operation of law when the FHLBB determines that the institution is in an unsafe or unsound condition"). Defendants contend that, had plaintiff remained employed at Home Owners, the RTC would have exercised its authority and terminated plaintiff's contract.

The evidence shows that, had plaintiff not been discharged, his future as an officer with Home Owners—Fergus Falls would have become less certain following the RTC's involvement. However, defendants failed to persuade this court that plaintiff's contract likely would have been terminated. Plaintiff's expert, James Kolveidt, testified that the continuation of plaintiff's former mortgage department position is significant. Further, to date, other officers with Home Owners—Fergus Falls have retained their positions. Thus, this court rejects defendants' argument that plaintiff's right to receive compensatory damages terminates as of April 30, 1988.

■ In determining an appropriate back pay award, this court has evaluated the markedly different opinions of each expert. The experts' back pay computations are based upon a comparison of plaintiff and officer Leabo's incomes. Plaintiff adopts Leabo's actual income from 1984–89 as plaintiff's potential income had he remained with Home Owners. On the other hand, defendants' expert relies upon the disparity between plaintiff and Leabo's income from 1983–89 to justify a much smaller potential income calculation for plaintiff. Each of these calculations is somewhat suspect. As noted earlier, plaintiff failed to show that Leabo's higher salary was not, in part, due to greater merit or responsibility vis-a-vis plaintiff, while defendants' calculation fails to consider that a portion of the discrepancy between plaintiff's and Leabo's salaries may be attributed to retaliatory wage discrimination. In any event, the experts' methods and calculations, along with the numerous submissions and exhibits, provide the court guidance in reaching an equitable judgment. The court concludes that plaintiff's adjusted past wage and fringe loss, to date of trial, including prejudgment interest, is $120,000.00.

■ Plaintiff contends that he is entitled to receive compensation for the future loss of wages and fringe benefits. This court may award front pay in lieu of reinstatement as an equitable remedy. *Woodline Motor Freight*, 852 F.2d at 1065. However, reinstatement may not be denied simply because of the animosity between plaintiff and defendants engendered by plaintiff's refusal to perjure himself or the prosecution of this lawsuit. *See Taylor v. Teletype, Corp.*, 648 F.2d 1129, 1138–39 (8th Cir.1981), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981); *Jones Truck Lines, Inc.*, 767 F.2d at 435, n. 1. The court nonetheless finds reinstatement unwise. It appears to the court that animosity exists between plaintiff and his former superiors and co-employees independent of the matters giving rise to this action.

■ The court finds a limited award of front pay appropriate. In ascertaining an appropriate award, the court finds that plaintiff is not currently receiving a salary or fringe benefits comparable to those he would be receiving had he not been improperly discharged. It further appears, based on the present progressive increase of his

income, and having in mind the range of income received by real estate agents similarly situated, that within several years plaintiff will likely earn a salary comparable to that which he would be earning at his former occupation. The court concludes that plaintiff's future adjusted loss, reduced to its present value, is $35,000.00.

■ At the conclusion of the liability phase, the state district court found that defendant Donley intentionally interfered with plaintiff's employment contract for the purpose of injuring plaintiff or advancing Donley's own interest. The court further found Donley's actions contrary to the interests of the Home Owners association, and his conduct demonstrative, by clear and convincing evidence, of a willful indifference to the rights of plaintiff. These findings justify an award of punitive damages.

■ Generally, an award of punitive damages is designed to punish a wrongdoer for extraordinary misconduct and to warn others against similar unlawful behavior. *Melina v. Chaplin*, 327 N.W.2d 19, 20 n. 1 (Minn.1982). This court must consider a number of factors in arriving at an appropriate punitive damage award. Minn.Stat. § 549.20, Subd. 3 (1990). Here, Donley's misconduct continued over approximately five years, culminating in plaintiff's discharge. During the damages phase of trial, it became apparent to this court that defendant Donley steadfastly refuses to acknowledge any whisper of wrongdoing on his part. He has simply declined to accept any responsibility for plaintiff's injuries. With respect to his financial condition, Donley receives an annual salary exceeding $90,000.00 and his net worth is approximately $400,000.00. Finally, an award of punitive damages will fittingly admonish others against similar conduct. In view of the state district court's findings and an analysis of the relevant factors outlined in Minn.Stat. § 549.20, Subd. 3, this court concludes that $25,000.00 in punitive damages shall be assessed against defendant Donley.

■ Plaintiff seeks to recover damages for loss of reputation and emotional distress. These damages appear recoverable as a matter of law under plaintiff's tortious interference claim. *Potthoff v. Jefferson Lines, Inc.*, 363 N.W.2d 771, 777 (Minn.Ct.App.1985). Plaintiff testified that the retaliatory termination impacted upon his personal life and that of his family in a number of ways. Plaintiff stated that he thought often about the termination and that it caused him much stress. Plaintiff apparently suffered from a rash on his left shin which he attributed to stress; however, plaintiff's doctor could not identify the cause. Finally, plaintiff testified that word of his firing spread quickly through the Fergus Falls community. The court finds plaintiff's evidence to be insufficient proof of emotional distress and loss of reputation. *See Eklund v. Vincent Brass & Aluminum Co.*, 351 N.W.2d 371, 379 (Minn.Ct.App.1984); *Potthoff*, 363 N.W.2d at 777.

■ Finally, plaintiff seeks to recover his costs and attorneys' fees incurred in the prosecution of this action. Minn.Stat. § 181.935(a) provides:

> In addition to any remedies otherwise provided by law, an employee injured by a violation of section 181.932 may bring a civil action to recover any and all damages recoverable at law, *together with costs and disbursements, including reasonable attorney's fees*, and may receive such injunctive and other equitable relief as determined by the court. (emphasis supplied).

An award of costs and attorneys' fees thus appears within the court's discretion. However, the court will await decision on this matter until hearing further from the parties. *See* Local Rule 6.

### Conclusion

Based upon the files, briefs, trial exhibits and testimony, and arguments of counsel,

IT IS ORDERED that:

1. Defendants Home Owners Savings Bank, F.S.B, Knutson Mortgage Corporation, Home Owners Federal Savings and Loan Association, and M. Gene Donley are liable to plaintiff in the sum of $155,000.00

as for past and future compensatory damages;

2. Defendant M. Gene Donley is liable to plaintiff in the sum of $25,000.00 as for punitive damages.

The court will file an order for judgment consistent with this opinion after ruling on the costs and attorneys' fees issues.

## APPENDIX A

State of Minnesota

County of Otter Tail

In District Court

Seventh Judicial District

Peter R. Piekarski, Plaintiff,

vs.

Home Owners Savings Bank F.S.B., f/k/a Western Minnesota Federal Savings and Loan Association; f/k/a, Western Minnesota Savings and Loan Association, f/k/a Fergus Falls Savings and Loan Association; Knutson Mortgage Corporation, a Delaware Corporation; Home Owners Federal Savings and Loan Association, a federally chartered savings and loan association, and M. Gene Donley, Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

Case No. C1–89–535

February 20, 1990

The above-entitled matter was called for trial before the undersigned and an advisory jury, commencing on November 28, 1989. At the close of the testimony, the matter was submitted to the jury on December 7, 1989, for their decision as to the causes of action set out on the Special Verdict, the remaining causes of action being left for decision by the Court. The jury having returned its answers to the Special Verdict on December 7, 1989, and the Court having reached its decision as to the remaining causes of action included herein;

NOW THEREFORE, pursuant to the Special Verdict of the jury, and the decision of the Court, the Court makes the following:

## FINDINGS OF FACT

I. At the completion of the evidence on the liability issues the jury was asked to make findings regarding three causes of action: Employment Agreement; Retaliatory Discharge; and, Intentional Interference with Contract. The jury returned the following verdict:

1. EMPLOYMENT AGREEMENT:

A. Did the plaintiff's employment agreement include terms that the plaintiff could be terminated only for good cause or unsatisfactory job performance?

YES X   NO___

B. Did defendants' termination of plaintiff's employment breach the agreement?

YES X   NO___

C. Did plaintiff's employment agreement include terms that he could be terminated only by the Board of Directors.

YES X   NO___

D. Did defendants' termination of plaintiff's employment breach the agreement?

YES X   NO___

E. Did plaintiff's employment agreement include terms that he could be terminated only following a fair warning?

YES X   NO___

F. Did defendants' termination of plaintiff's employment breach the agreement?

YES X   NO___

2. RETALIATORY DISCHARGE:

A. Did the defendants terminate plaintiff's employment because he was requested to testify at a trial involving defendant Gene Donley's parents?

YES X   NO___

B. Did the defendants terminate plaintiff's employment because the plaintiff refused to participate in any activity that he in good faith believed

violated any state or federal law or rule or regulation?

YES X NO___

C. Did plaintiff inform his employer of his reason for the refusal?

YES X NO___

D. Has the plaintiff proven that the defendants had no valid business reason for plaintiff's termination?

YES X NO___

E. Did the defendants conduct toward the plaintiff show, by clear and convincing evidence, a willful indifference to the rights of the plaintiff?

YES X NO___

3. INTENTIONAL INTERFERENCE WITH CONTRACT:

A. Did defendant Gene Donley act outside the scope of his employment in terminating the plaintiff?

YES X NO___

B. Was the defendant, Gene Donley, aware of the essential terms and conditions of plaintiff's employment agreement?

YES X NO___

C. Did the defendant, Gene Donley, intentionally interfere with the plaintiff's employment agreement?

YES X NO___

D. In terminating plaintiff's employment, did the defendant, Gene Donley, act for the purpose of injuring the plaintiff or advancing his own interests, contrary to the interests of the association?

YES X NO___

E. Did the defendant Gene Donley's conduct toward the plaintiff show, by clear and convincing evidence, a willful indifference to the rights of the plaintiff?

YES X NO___

The Court finds that there was sufficient evidence to support the findings by the jury and hereby adopts the verdict as the findings of the Court.

II. Having approved and adopted the findings of the jury on the issues submitted to them the Court now makes the following findings regarding the issue of misrepresentation:

A. That defendants' made numerous material misrepresentations of fact to the plaintiff regarding his employment, and did so intentionally, negligently, and with careless disregard for whether they were true or false.

B. That defendant knew that the representations being made to the plaintiff were false, or made no effort to ascertain whether they were true or false.

C. That the plaintiff justifiably relied on the representations of the defendants, to the detriment of the plaintiff.

D. That the plaintiff has suffered damages as a result of the misrepresentations made to him by the defendants.

III. Damages. The issues of liability and damages were bifurcated for trial in this case. The liability issues have now been resolved in plaintiff's favor. Plaintiff is therefore entitled to receive:

A. From defendants Home Owners, Knutson and Home Owners of Boston such compensatory damages and such other relief as may be authorized by law.

B. From defendant Donley such compensatory damages, punitive damages and such other relief as may be authorized by law.

IV. The attached Memorandum is hereby incorporated herein as though fully set forth in these findings.

CONCLUSIONS OF LAW

The defendants are liable to the plaintiff and the plaintiff is entitled to receive:

A. From defendants Home Owners, Knutson and Home Owners of Boston, such compensatory damages and such other relief as may be authorized by law.

B. From defendant Donley, such compensatory damages, punitive damages and such other relief as may be authorized by law.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated this 20 day of February, 1990.

/s/ Harlan L. Nelson
Harlan L. Nelson
Judge of District Court

## MEMORANDUM

There are several parties involved in this lawsuit. The plaintiff is Peter R. Piekarski, hereafter referred to as Piekarski. The defendants are Home Owners Savings Bank of Fergus Falls, the former employer of Piekarski, which, during the course of its existence has also used the names Western Minnesota Federal Savings and Loan Association, Western Minnesota Savings and Loan Association, and Fergus Falls Savings and Loan Association, all of which are collectively referred to herein as Home Owners; M. Gene Donley, hereafter referred to as Donley, the president of Home Owners at the time of Piekarski's termination of employment; Home Owners Federal Savings and Loan Association, a federally chartered savings and loan association located in Boston, Massachusetts, hereafter referred to as Home Owners of Boston; and, Knutson Mortgage Corporation, hereafter referred to as Knutson, a Delaware corporation and subsidiary of Home Owners of Boston.

The evidence presented at trial indicates that Piekarski was never employed directly by Knutson, or by Home Owners of Boston, or by Donley in his individual capacity. Home Owners of Boston, through its subsidiary, Knutson, began the process of acquiring Home Owners in 1987, and completed the acquisition in the first days January 1988. Neither Knutson nor Home Owners of Boston suggested or gave any orders for personnel changes at Home Owners. There is no evidence that Knutson or Home Owners of Boston were personally involved in the termination of Piekarski or the decision to terminate. Home Owners was the wholly owned subsidiary of Knutson at the time of Piekarski's termination. Knutson was the wholly owned subsidiary of Home Owners of Boston.

In determining whether or not the employment contract that existed between Piekarski and Home Owners was for employment of any type other than at will, and whether or not that employment contract contained provisions requiring that there be just cause for termination, this Court is guided by general principles that have previously been adopted by decisions of the Minnesota Supreme Court and the Minnesota Court of Appeals.

Generally, the relationship between an employer and an employee is an at will employment relationship, meaning the relationship is voluntary. Either the employer or employee may terminate the employment relationship at any time. Absent a contract between the employer and the employee modifying the at will relationship, the employer is free to discharge the employee without cause or other limitation, and the employee is free to leave employment at any time.

The Minnesota Supreme Court, in *Skagerberg vs. Blandin Paper Company*, 197 Minn. 291, 266 N.W. 872 (1936), stated the basic at will employment rule as follows:

> *"In the absence of additional express or implied stipulation as to the duration* of the employment or of a good consideration additional to the services contracted to be rendered, a contract for permanent employment, for life employment, for as long as the employee chooses, or for other terms purporting permanent employment, is no more than an indefinite general hiring terminable at the will of either party."* (emphasis added).

This basic rule was reaffirmed in the case of *Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520, 117 N.W.2d 213 (1962). In that case, the Supreme Court reiterated the employment at will rule in these terms:

> "The usual employer-employee relationship is terminable at the will of either; the employer can summarily dismiss the employee, the employee is under no obligation to remain at the job. A hiring for an indefinite period is terminable at will. *Unless plaintiff can establish that she was to be dismissed only for cause by proving a contract to that effect, her employment could be terminated at*

*any time and without cause.* (emphasis added).

In *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983), the Minnesota Supreme Court recognized an important exception to the traditional at will employment rule. In *Pine River*, the Court held that there may be a unilateral employment agreement established, if the plaintiff in the action could establish four essential elements. One, an offer to create employment on terms that are definite in form. Two, the offer has been communicated to the employee. Three, the employee has accepted the offer, and four, the employee is furnished adequate consideration.

In determining whether or not the relationship between Piekarski and Home Owners was anything other than at will, the issue was submitted to an advisory jury, which was to determine the credibility and the believability of the witnesses, and to resolve the disputed issues of fact.

In answer to question 1A, "Did the plaintiff's employment agreement include terms that the plaintiff could be terminated only for good cause or unsatisfactory job performance?", the jury found there was an employment contract which did contain provisions that Piekarski's employment could be terminated only for good cause or unsatisfactory job performance.

The evidence in this case is undisputed that Piekarski and Home Owners entered into an employment agreement, whereby Piekarski commenced work at Home Owners on March 1, 1973, and continued in that employment until the date of his termination on January 26, 1988.

The parties, however, dispute the terms and conditions of that employment contract. Piekarski contends that the employment contract provided that he could be terminated only for just cause or unsatisfactory job performance following a fair warning and by action of the Board of Directors. The defendants contend that the employment relationship was an employment at will and could be terminated at any time, without cause and without reason. The evidence in this regard was vigorously contested and disputed. The evidence was disputed by Piekarski's witnesses claiming a contract with specific terms requiring termination for just cause or unsatisfactory job performance, following a fair warning and action by the Board of Directors, and the defendants' witnesses claiming that the employment was at will. In addition to these disputes the evidence was often conflicting and contradictory with a witness saying one thing on direct examination and the opposite thing on cross examination. David Leabo, the vice president and controller, as well as personnel manager of Home Owners, indicated that all employment was definitely at will. However, he further testified that it was the practice and policy of the association that termination would be only after remedial measures were first adopted, implemented and found to be unsuccessful, and that termination of employment was the last alternative. Another example of disputed facts is the following question and answer that was propounded to Mr. Robert Bigwood, the chairman of the Board of Directors of Home Owners:

Q: Has the bank ever, to your knowledge, made it a policy or practice to retain officers as employees, as long as they perform their job satisfactorily?

A: No, not as setting out a policy.

I think normally, that is the result. *If people perform their job satisfactorily they are going to have continued employment.* (emphasis added).

The jury impaneled in this case had an opportunity to listen to the testimony of all the witnesses and to review all of the exhibits entered into evidence. They also had the opportunity to resolve all factual disputes. In affirming or disaffirming the findings of the jury, this Court must review all of the evidence and determine whether or not Piekarski has proven some "additional express or implied stipulation as to the duration of his employment." *Skagerberg*, supra. The Court must also determine whether Piekarski can establish that he "was to be dismissed only for cause by proving a contract to that affect." *Cederstrand*, supra. Finally, it must be determined that there was an offer with definite

terms, communicated to Piekarski, who accepted the offer, and furnished adequate consideration. *Pine River*, supra.

The defendants' claim that the employment contract was merely an at will agreement is inconsistent with the findings of the jury. This Court finds there is ample evidence to support the jury verdict and hereby adopts their findings.

### I. EMPLOYMENT AGREEMENT— Special Verdict Questions 1A, 1C, 1F

In determining whether or not the employment agreement between Piekarski and Home Owners was an at will contract as proposed by the defendants, or an employment contract providing for termination only for just cause or unsatisfactory job performance following fair warning and by action of the Board of Directors, as advocated by Piekarski, this Court, after reviewing a number of factors agrees, adopts and affirms the decision by the jury in this case.

A review of fourteen factors considered by this Court in reaching this decision follows.

1) PROBATION. Piekarski, at the time of his initial employment, was placed on a nine month probationary period. All of the other officers likewise, were hired on a probationary period. The more recently employed officers were placed on a shorter period of probation. Plaintiff's Exhibit 102. However, all officers were hired with some period of probation, followed by what Piekarski testified was to be "job permanence". The hiring of a person on probation followed by "job permanence" is a factor tending to show an employment agreement that is something other than at will. If an employee is hired strictly as an at will employee, the employee may be removed at any time without cause or reason. It is unnecessary to place an employee on a probationary period if he is strictly an at will employee. The hiring of the officers of Home Owners on a probationary period is a factor which is inconsistent with the position of the defendants, and is a factor that would be consistent with Pie-

karski's position. However, this factor alone certainly is not conclusive as to the employment arrangement between the parties.

2) ANNUAL APPOINTMENT OF OFFICERS. The officers of Home Owners were appointed annually for one year terms by the Board of Directors. Plaintiff's Exhibit 29. The appointment of officers for a one year term is a factor that would be inconsistent with the at will employment agreement argued by defendants, and would be consistent with Piekarski's position that his employment was something other than at will. Here again, this factor standing alone is not conclusive as to the employment arrangement between the parties.

3) ANNUAL SALARY. Testimony presented by both sides established that the officers had their salaries set on an annual basis. Each year they received notice from either the president or the chief executive officer that their salary for the coming year has been set at a certain amount. Plaintiff's Exhibits 4–6, 11, 28A, 28C, 28D, 86, 95, 106, 107. An at will employee is normally paid on a per hour basis, or, at most a per week basis. Setting a salary for the entire year is a factor that certainly could be considered by the jury, and is being considered by this Court, as inconsistent with an at will agreement, and more consistent with Piekarski's contentions.

4) ANNUAL REVIEWS. For many years, each of the officers of Home Owners received a formal annual review near the time of the setting of salaries and reappointment of officers for the forthcoming year. Plaintiff's Exhibits 31–33. At will employees are normally not provided an annual review, since their employment can be terminated at any time without cause and without reason. Annual review of the officers is a factor that would be inconsistent with the defendants' contention that this was strictly an at will employment agreement, and would be more consistent with Piekarski's position.

5) JOB SECURITY REPRESENTATIONS. At the time of the annual setting of salaries and reappointment of officers,

each officer received a letter from either the president or the chief executive officer. Many of the letters indicated to the officers that their raises and benefits were not what the officers may have expected. Plaintiff's Exhibits 11, 95, 107. However, in exchange for these somewhat lower salaries, they were assured that defendant's goal for them was "job security." Plaintiff's Exhibits 11, 95, 107. The offering of "job security" in exchange for lower salaries is a factor that would be inconsistent with an at will employee, and consistent with an employee whose job required cause for termination, as Piekarski contends.

6) BUILDING A FILE. Donley had personnel files on a number of the officers of Home Owners, including Piekarski. Plaintiff's Exhibits 34–45, 47, 50, 87; Defendant's Exhibits 2, 5. These acts by management of building files on employees are certainly factors inconsistent with the management's position that they may terminate an employee without cause at any time. Building a file, as in this case, where numerous acts of alleged misconduct were documented and placed in the file, is a factor that would indicate an intent on the part of management that termination required good cause. The building of a file is a factor more consistent with Piekarski's contention that termination could be only for cause. The only reason advocated by Home Owners for building these files was in order to establish cause, therefore indicating their belief that these employment contracts did require cause for their termination. Although this factor is not conclusive, it certainly is an important factor, tending to show that there was an employment agreement that required cause prior to termination.

7) PAST PRACTICES OF TERMINATING FOR CAUSE. Piekarski understood that as long as he performed satisfactorily he would continue as an officer of Home Owners. However, he also realized that Home Owners had the right to terminate him, under certain guidelines, if he was not performing adequately. Piekarski contends that the guidelines require cause for termination. There was testimony that two other officers of Home Owners had their employment terminated, namely John Morgan and Gary Froehlich. Both of these terminated employees had files compiled showing cause for their termination. Although John Morgan was not warned of his termination, certainly the acts he committed would justify an immediate termination of his employment, even if the company had a policy providing fair warning prior to termination. Mr. Morgan sent a derogatory racial remark over the inter-office communication system between each of the numerous branches of Home Owners on Martin Luther King Day. Such conduct by any employee would be grounds for immediate termination. However, Mr. Morgan's employment was not terminated at that time. According to David Leabo, the vice president and personnel manager of Home Owners, Mr. Morgan was not terminated until after he intentionally destroyed or damaged a typewriter belonging to Home Owner's Pelican Rapids office. This was an act that would have amounted to criminal damage to Home Owner's property. The termination of Gary Froehlich was documented by a writing stating his deficiencies. Plaintiff's Exhibit 62. He was given a year in which to correct those deficiencies which had been documented and acknowledged, and only after they went uncorrected for that period of time, was he terminated. It appears that the past practice of Home Owners was to provide cause for the termination of any officers. Certainly this past practice is an indication of what Home Owners intended the agreement amongst all officers to be, and that practice is inconsistent with their position of an at will employment agreement. It appears to be more consistent with Piekarski's position.

8) PAST PRACTICE OF FAIR WARNING. Terminated officer Gary Froehlich, was given an adequate one year warning, although John Morgan was not warned. The circumstances surrounding John Morgan's termination would require an immediate termination, even without any kind of a warning. Therefore, the past practice of Home Owners regarding deficient conduct had been to give fair warning. Certainly,

this past practice of fair warning is a showing of intent on their part to provide fair warning before the termination of any officer. This practice is inconsistent with employment at will and consistent with Piekarski's position.

9) ORAL AGREEMENT AT TIME OF HIRING. Although the evidence was disputed as to the terms and conditions of Piekarski's hiring, Piekarski testified that he was assured of job permanence. The president of Home Owners at the time of Piekarski's hiring was Charles Peterson, who testified that he did not make those statements. The credibility and the believability of all witnesses was a factor that was to be considered by the jury. Their verdict indicated that they accepted the testimony of Piekarski. It would appear then, that Piekarski's testimony provides another factor in determining whether or not this was an employment at will agreement or something beyond that. Piekarski indicated that he was told by the hiring officer that after having successfully passed the probationary period, he would have "job permanence". Also, Charles Peterson gave the impression that if he successfully passed the probationary period, "there was a definite future for an officer ..." at Home Owners. The offering of "job permanence" and oral representations of a "future" certainly are inconsistent with an at will employment agreement, but are consistent with Piekarski's contentions that the employment contract provided only for cause termination.

10) WRITTEN OFFER BY PRESIDENT. Piekarski was hired by Charles Peterson, who, as bank president, sent Piekarski a written offer of employment. The letter offering the position of Mortgage Loan Officer indicated that the position had a "future". Plaintiff's Exhibit 3. When the president of the bank indicates to an employee that the position that he has been offered has a "future," that statement is inconsistent with an employment at will agreement where future employment is uncertain. However, a position with a "future" is consistent with Piekarski's position that he was more than an employee at will.

11) ORAL TESTIMONY OF PERSONNEL MANAGER. David Leabo, the vice president and controller, as well as the personnel manager of Home Owners, stated that as long as an employee does a satisfactory job, the employee will have continued employment. He further stated that unless there is cause to terminate, an employee will keep his position. Also, if the job itself was eliminated a person could lose their job in that manner. Therefore, if the job was not eliminated it took cause to terminate. However, Piekarski's position was not eliminated, as Stephen Kopkie was promoted to that position upon his termination. Furthermore, there was testimony by Leabo that Piekarski's department was productive. Also, Leabo, as one of the top three officers, was in charge of all activities relating to human resources at Home Owners. Plaintiff's Exhibit 102. This included discipline and termination of employees. The discipline and termination process involved trying to correct the particular situation at the time of occurrence by talking things out with the employee. It required fairness and a warning, with termination being the last straw in the process. The practices as annunciated by the head of personnel certainly show a policy on the part of Home Owners to require cause for termination. The practices as set forth by the personnel director are inconsistent with an at will employment agreement and consistent with Piekarski's contentions.

12) ORAL TESTIMONY OF CHAIRMAN OF THE BOARD. Mr. Robert Bigwood was the Chairman of the Board of Directors at Home Owners during a portion of the time Piekarski was employed there. In his testimony Bigwood was asked if Home Owners "ever to his knowledge, made it a policy or practice to retain officers as employees, as long as they perform their job satisfactorily?" To this he stated that "I think normally, that is the result. If people perform their job satisfactorily they are going to have continued employment" at the bank. When the Chairman of the Board indicates that it is

the practice of Home Owners to provide continued employment as long as there is satisfactory performance, this is strong evidence that Home Owners had a policy relating to their employment, which provided for termination only for cause. This is inconsistent with an employment at will agreement, but is consistent with Piekarski's position.

13) APPLICATION TO SELL ASSOCIATION TO KNUTSON MORTGAGE. The Board of Directors made an application to sell Home Owners to Knutson, and indicated in the application that there were no plans to change the structure or functioning of the management officials of the bank due to the acquisition by Knutson. Plaintiff's Exhibit 80. It further indicated that all officers of the bank prior to the acquisition would continue in the same capacities after the acquisition. Written statements that all officers would keep their positions in this instance is inconsistent with an employment at will agreement in which there are no assurances of continued employment. This assurance shows an intent by Home Owners that Piekarski would have continued employment at the bank and not be terminated without cause.

14) BYLAWS. The bylaws of Home Owners have a provision regarding the election of officers on an annual basis, and further provide that "[a]ny officer may be removed by the board of directors whenever in its judgment the best interests of the association will be served thereby, but such removal, other than for cause, shall be without prejudice to the contractual rights, if any, of the person so removed." Plaintiff's Exhibit 29. This is strong evidence indicating that Piekarski's employment contract did provide that termination would be only for cause. Although the bylaws that were introduced in evidence were dated 1988, all the parties throughout the trial assumed that those bylaws had been in effect, and this Court is likewise assuming the copy that was introduced in evidence was simply a copy of what had been in effect throughout the entire employment period of Piekarski. When the bylaws of

Home Owners speak of termination for cause, certainly this is a provision that Home Owners is bound by, and along with all of the other factors, shows that there was in fact, an employment agreement requiring termination for cause. The provisions in the bylaws are inconsistent with an employment at will agreement, and appear to be consistent with the Piekarski's position.

Piekarski has claimed that he could be terminated only for just cause or unsatisfactory job performance following fair warning and action by the Board of Directors. Home Owners contends that there was merely an employment at will agreement by which they could terminate Piekarski at any time and without cause. The *Skagerberg* case indicated that employment at will was the rule "in the absence of additional express or implied stipulation as to the duration of the employment ..." The *Cederstrand* case established that cause was not necessary for termination "unless plaintiff can establish that (s)he was to be dismissed only for cause by proving a contract to that affect ..." The test set forth in the *Pine River* case requires the plaintiff in an action to establish that there was an offer in definite terms, communicated to the employee, who accepted the offer, followed by the employee furnishing adequate consideration. Evidence produced by Piekarski establishes that there were additional express or implied stipulations as to the duration of his employment, and that he had a contract calling for termination only for cause. The evidence also establishes that there was an offer in definite terms, communicated to Piekarski, who accepted, and he then furnished adequate consideration.

Piekarski was placed on a nine month probationary period at the time he was hired, and was told by Charles Peterson that the position had a future. Upon completion of the probationary period he was promised job permanence by Charles Peterson. Also, following his probationary period there were annual salaries, annual reviews of job performance and the annual election of officers by the Board of Directors. Piekarski and other officers re-

ceived a relatively small raise, but were offered job security in place of a larger increases.

In addition to these factors, Piekarski produced evidence that he could be terminated only for just cause or unsatisfactory job performance. Donley built a file showing purported acts of misconduct by Piekarski, indicating a need to show cause for termination. It was also established that other officers were terminated only for cause, and that it was a practice to give a warning prior to termination. The personnel manager, who was one of the top three officers at Home Owners, and a former chairman of the Board of Directors both testified that persons who performed their jobs satisfactorily would continue their employment at Home Owners. Piekarski and the other officers were also assured that following the acquisition by Knutson, they would all remain in their same capacities. Finally, the bylaws of Home Owners refer to "for cause" in reference to removal of officers.

The jury found these factors sufficient to establish that Piekarski's employment was terminated in violation of his employment agreement. It is the determination of this Court that the findings of the jury are supported by the evidence presented.

## II. BREACH OF CONTRACT—Special Verdict Questions 1B, 1D, 1E

The jury determined that Home Owners had breached the provisions of the employment contract requiring that Piekarski be terminated only for just cause or unsatisfactory job performance following fair warning and by action of the Board of Directors. In reviewing the evidence, this Court finds that there was adequate evidence to support that verdict, and hereby adopts the decision of the jury which found that the contract provisions were breached by Home Owners.

Piekarski, at the time of his termination, was the vice president in charge of mortgage lending at Home Owners. Further testimony established that the mortgage lending department of Home Owners was a successful operation during the period of time that Piekarski was managing the department. Also, his department was financially solvent and made money for the association.

Although Home Owners did not acknowledge that they required cause for Piekarski's termination, they nevertheless presented evidence during the course of the trial intending to justify the termination on a cause basis. Plaintiff's Exhibits 34–45, 47, 50. The jury disagreed with that contention, and this Court finds that there is adequate evidence to support the jury's conclusion that Piekarski's termination was without cause.

During the period of time that Piekarski was operating a successful mortgage loan department, testimony of several witnesses established that the management of Home Owners engaged in a course of investments which resulted in the total wipe-out of the net worth of the association. These investments lost the owners of the association approximately seven million dollars during a period of only three years. The complaints of Piekarski's conduct simply do not justify his termination on a cause basis. The evidence indicates that he performed his job in a satisfactory manner and was one of the few officers that did, in fact, operate a department at a profitable level. Other officers were less successful and remain as officers of Home Owners. The termination of the Piekarski's employment was a breach of his contract provision requiring good cause, and the termination was without sufficient justifiable reasons.

It is undisputed that there was no adequate or fair warning prior to Piekarski's termination. He was simply called into the office of two of the officers and advised at 10:00 a.m. that he was terminated, and that he should leave the premises immediately. Piekarski was, however, granted permission to remain at his desk throughout the remainder of the day, but then was directed not to return. Certainly, he was given no warning of his termination, which was in violation of the contract requiring termination only upon fair warning.

Donley instructed Leabo and Vye to think about which officers should go forward under the new ownership of the bank. Nothing in the evidence indicates that the Board of Directors took any action in this regard. The Board's minutes do not reflect Piekarski's termination or that the Board's approval was sought or given. The minutes merely refer to Board members elected for 1988, including Stephen Kopkie as vice president of mortgage lending, Piekarski's former position. Plaintiff's Exhibit 72. Termination of Piekarski by Donley was in violation of his employment contract and the bylaws of the association, as the Board of Directors took no action in this regard, and was not even aware that this action was taking place.

## III. RETALIATORY DISCHARGE

The jury determined that Piekarski's termination resulted from his being subpoenaed to testify at a trial involving defendant Donley's parents. This finding was based upon a number of factors which, when combined, the jury determined to be sufficient evidence that Piekarski's termination was retaliatory in nature. This Court agrees with the jury and finds that although no single factor may have been determinative, all the evidence together indicates that Piekarski's termination was related to his testifying in the trial involving Donley's parents.

Piekarski was the mortgage loan officer at the bank for nearly ten years prior to the time Jerry and Denise Gerhardson came to Home Owners seeking a loan for the purchase of a home from Donley's parents. Piekarski eventually became the person in charge of handling their loan application. After the loan process began, Piekarski approached Donley to discuss the matter, at which time Donley suggested an FHA loan. This type of loan would accommodate his parents' desire to receive the entire purchase price in a lump sum, rather than over a number of years. After expressing some concerns to Donley, Piekarski continued to process the loan and discovered that the FHA loan required the septic system to be improved so that it would meet prescribed standards. It also required that an escrow account be set up to pay for the system in an amount equal to one and one-half times the estimated cost. Piekarski brought this matter to the attention of Donley, who said no escrow would be necessary, as his parents had money on deposit at Home Owners in interest bearing accounts and they did not want to lose the interest. Donley also stated that if Piekarski did not trust his parents, Donley himself would be responsible.

When the septic system problem was discovered, the Gerhardsons and the Donleys executed an addendum to the purchase agreement, stating that the system had to be improved so as to meet the approval of the Land Resource Use Office. It was the understanding of the parties that any system meeting the requirements of the loan would be acceptable. However, the Donleys were never satisfied with the estimates for the work and performance never started, so the Gerhardsons got an offer on a drain field system and had the work done. The Donleys refused to pay, claiming the addendum called for a holding tank system and not a drain field system. Donley's parents went to the bank to talk with their son on several occasions, and later produced a copy of the addendum which they claimed showed that they were responsible to pay less for the septic system than the Gerhardsons were seeking. Piekarski knew the addendum had been altered as he had a copy of the document, and his secretary had typed the original document.

Piekarski's disagreement with Donley's parents resulted in a call from Donley, in which he stated that Piekarski should not have tried to involve him in his parents' transactions. He twice stated that Piekarski was "treading on thin ice". Piekarski was then called to Donley's office. While there, Donley pounded his finger on the desk and asked Piekarski twice, "do you want me to ask for your job?" Piekarski stated that he believed this course of conduct to indicate that he should do as he was told regarding Donley's parents, or he would be fired.

When the septic system problems could not be resolved, the Gerhardsons brought a lawsuit against Donley's parents to recover the cost of the work done on the system. Piekarski was subpoenaed to testify in favor of the Gerhardsons and he informed Donley of his being subpoenaed. When Donley saw the subpoena he gave Piekarski a stern look before turning his back and walking away without saying a word. Based upon prior discussions with Donley concerning this matter, and the reaction of Donley to the subpoena, Piekarski, in good faith, believed that Donley was warning him that he had better not testify against Donley's parents. The jury in the present case found that Piekarski was justified in his belief that Donley wanted him to commit perjury or avoid the subpoena.

During and after the matter with Donley's parents, Donley's attitude toward Piekarski began to change. Piekarski simply could not satisfy Donley. Donley himself testified that after January of 1983 he became unhappy with Piekarski's work. No mention was made of Piekarski's work prior to that time. The escrow problem with Donley's parents began with the loan application in early 1983. There were six exhibits entered into evidence regarding notes in Piekarski's personnel file prior to 1983. Three of these were annual reviews that showed satisfactory ratings, and three of the notes, covering five different dates, were critical of Piekarski's work. There were eleven more exhibits regarding notes placed into Piekarski's file from 1983 until his termination in January 1988. There were negative comments about him on all of the notes, which covered seventeen different dates. Also, Piekarski was not formally reviewed in 1982–1984, but was reviewed by Donley in January 1985, only a few months after the Gerhardson–Donley trial. Personnel manager, David Leabo, and Jeffrey Vye also noticed that Donley's personal feelings toward Piekarski were affecting his business judgment.

Evidence was introduced at trial showing that in the ten years prior to the escrow matter involving Donley's parents, Piekarski's department was consistently functioning in a productive manner. There were few criticisms directed toward Piekarski or his department during that period. Testimony showed that his department brought profits to Home Owners while other officers, including Donley and David Leabo, had made decisions which had cost the association sizable losses. Piekarski was terminated while these other officers remain employed at Home Owners. In comparison, any problems created by Piekarski seem rather small next to those of some of the other officers at the bank. It was also noted in the testimony that the other employees liked Piekarski, as did the customers. The only person Piekarski did not seem to get along with was Donley, who was known to have had conflicts with other officers as well as Piekarski. All of this evidence seems to support the finding of the jury that Piekarski was discharged by Donley in retaliation for testimony in the trial of Donley's parents.

## IV. INTENTIONAL INTERFERENCE WITH CONTRACT

Piekarski claims that Donley intentionally interfered with the contractual relationship between himself and Home Owners. The jury concluded that Piekarski was correct, and based upon the evidence presented at trial the Court agrees with the jury's determination. Many factors were considered by the jury and the Court in reaching this conclusion.

Piekarski had an employment contract with Home Owners. The jury determined that as the president of the bank, Donley was aware that this relationship existed and was aware of the terms and conditions of the employment agreement.

During the course of Piekarski's employment with Home Owners he was involved in a number of disagreements with Donley. Piekarski was wrongly blamed for a letter of criticism sent to the Board of Directors by Nancy Pennings after she quit her employment at Home Owners. Plaintiff's Exhibit 89. Donley also found fault in Piekarski for the troubles encountered with Donley's parents, and for attempts by Piekar-

ski to help Jeffrey Vye in disagreements with management over vacation time he had earned.

It was obvious to a number of people that Donley did not get along with Piekarski. Piekarski was verbally attacked by Donley in the presence of another employee, Ken Pike, without provocation. This was another example of the animosity Donley felt toward Piekarski.

Donley claims that Piekarski's termination was at the recommendation of Vye and Leabo, but the evidence indicates that Donley was solely responsible for the decision. Vye and Leabo were instructed to review the officers of the bank and decide which ones they should retain after the acquisition by Knutson. They both testified that Donley also went through part of Piekarski's personnel file with them, pointing out selected notes he had entered in the file. All of the notes they looked at were negative toward Piekarski.

Further evidence of Donley's interference in the contract is seen by his removal of Piekarski for cause when no cause existed. Donley compiled a file on Piekarski intending to establish cause for terminating him. The testimony of several witnesses indicated that many of the notes in the file were vague, undated or dealt with incidents that were minor in nature. Donley then proceeded to terminate Piekarski without seeking any action by the Board of Directors. This was in violation of the provision in the bylaws which required Board of Directors action for removal of officers.

Donley also failed to give any warning to Piekarski. Donley had Vye and Leabo inform Piekarski of his termination at ten o'clock in the morning on the day he was told to leave. Donley was out of town at the time and instructed the other officers to take care of the matter so he would not have to go through the stress.

Based upon the testimony and other evidence in this case, it is apparent that Donley, while acting outside the scope of his employment, did intentionally interfere with the employment contract of Piekarski.

Also, he did this with the purpose of advancing his own interests contrary to the best interests of Home Owners, and with willful indifference to the rights of Piekarski or the harm caused to him. Donley was the president of the bank, and as such, was in a position to control the information that went to the Board of Directors. He was able to tell them whatever he wished regarding Piekarski, whether true or false, and the board generally went along with Donley's suggestions. Piekarski was well liked by the customers of the bank. Also, it was the customers who were the owners of the bank at that time. It would be in the best interests of the owners to have an employee who was well liked and highly experienced such as Piekarski.

Piekarski was not the type of person to keep quiet if he felt management was making a bad decision for the bank. He frequently asked for things that would improve the bank's performance. Evidence established that Donley seldom listened to any of his suggestions. Donley was also the one who negotiated the sale to Knutson and negotiated employment contracts for himself, Vye and Leabo. With nobody to question these moves Donley was able to advance his own interests and salary with little difficulty. It was better for Donley's own well being to get rid of Piekarski.

## V. MISREPRESENTATION

Piekarski was employed by Home Owners for a period of approximately fifteen years. During the course of his employment, a number of annual reviews of his job performance were conducted. These reviews, including the final one he received in January of 1987, concluded with satisfactory overall ratings. Plaintiff's Exhibits 31–33. Piekarski also received notice of annual raises by means of letters from the president of the bank, all indicating satisfactory performance. Plaintiff's Exhibits 4–6, 28A, 28C, 28D. During this same time period, Donley was compiling information in Piekarski's personnel file purporting to show numerous problems with Piekarski's job performance. Plaintiff's Exhibits 34–45, 47, 50, 87. Testimony established that most of the items in Piekarski's personnel

file were not brought to his attention, while he was aware of the results of his annual reviews. Therefore, based upon the information that Piekarski had available, his job was secure and his performance was satisfactory. However, Donley chose to make that representation to Piekarski rather than discuss the information in his personnel file. Therefore, it appears as though Donley misrepresented to Piekarski, whether intentionally, negligently or recklessly, that his job performance was fine and his position secure.

During his employment at Home Owners, Piekarski served as vice president of mortgage lending and also assistant secretary. At the time of Piekarski's termination, he still held those positions. In the year prior to Piekarski's termination, Knutson was in the process of acquiring Home Owners. Piekarski's testimony, and that of several other officers, established that due to the concerns of many of the officers, Donley on several occasions indicated that he would do everything he could to keep the officers intact after the acquisition. He also indicated in Home Owner's business plan that all of the officers were expected to remain in their same capacities after the acquisition. Plaintiff's Exhibit 78. It was also represented that Knutson's primary aim was to augment and develop the existing staff of Home Owners. Plaintiff's Exhibit 80. Piekarski was aware of these representations during the final year of his employment. He expected to continue his employment and performed as though it would continue. He relied upon the representations of continued employment and did not begin to seek other employment. To Piekarski's knowledge, he was going to be a part of the organization after the acquisition. The evidence indicated that Donley had already planned to terminate Piekarski, but did nothing to inform him of that intention.

Other evidence produced at trial also shows Donley's intention to terminate Piekarski. In the year prior to the termination, Donley began to bypass Piekarski in dealing with the mortgage loan depart-

ment. He began going to Stephen Kopkie when matters concerning Piekarski's department had to be discussed. This was done without informing Piekarski, who was the head of the department. Piekarski was also aware that Knutson intended to focus on home loan mortgages after the acquisition, leading him to believe his role at Home Owners would increase. Again, no mention was made to Piekarski that his job was in jeopardy or that he would not be part of the organization when Knutson completed the acquisition.

At the time of Piekarski's termination he was told that the reason for his dismissal was "corporate restructuring". Plaintiff's Exhibit 30D. However, there is no indication from the evidence produced at trial that any corporate restructuring occurred. Piekarski's position still exists, as Stephen Kopkie was promoted to replace him immediately after he was terminated. Stating that corporate restructuring was the reason for termination was a representation by Donley to Piekarski which was false. This was an intentional misrepresentation on the part of Donley.

Based upon the facts mentioned above as represented to Piekarski, a material misrepresentation has occurred. Donley either knew these representations were false, or they were negligently made, or were made with careless disregard for the truth. It also appears as though Piekarski justifiably relied on the representations of Donley and has suffered damages as a result.