956 F.2d 1484
 121 Lab.Cas. P 56,819
 Peter R. PIEKARSKI, Plaintiff-Appellee,
v.
HOME OWNERS SAVINGS BANK, F.S.B., formerly known as Western
Minnesota Federal Savings and Loan Association, formerly
known as Western Minnesota Savings and Loan Association,
formerly known as Fergus Falls Savings and Loan Association,
Defendant-Appellant,
Knutson Mortgage Corporation, a Delaware corporation; Home
Owners Federal Savings and Loan Association, a
federally chartered savings and loan
association; Resolution Trust
Corporation, Defendants,
M. Gene Donley, Defendant-Appellant.
 No. 91-2132.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 12, 1991.
Decided Feb. 28, 1992.
 
 Charles A. Mays, Minneapolis, Minn., argued, for defendant-appellant.
 William P. Luther, Minneapolis, Minn., argued, for plaintiff-appellee.
 Before JOHN R. GIBSON, Circuit Judge, FRIEDMAN,* Senior Circuit Judge, and MAGILL, Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 Home Owners Savings Bank (Home Owners) and its president, M. Gene Donley, appeal from the trial court's judgment in favor of Peter Piekarski on claims relating to Piekarski's discharge from his employment at Home Owners.[1] Specifically, both Home Owners and Donley were found liable for retaliatory discharge and breach of an employment contract. The trial court also found Donley liable for misrepresentation and tortious interference with contract. Additionally, the court imposed punitive damages on Donley. Home Owners and Donley challenge these findings, primarily on sufficiency of the evidence. We reverse all findings of liability.
 
 I.
 
 2
 Because the factual history of this case is extensive, we will discuss the specific details of the dispute only as they relate to each of Piekarski's many claims. Initially, we will provide a more general background. Piekarski began his employment at Home Owners in 1973 as a mortgage lending officer. Charles Peterson, then president of Home Owners, hired Piekarski. From the beginning of his employment, Piekarski performed many of his job functions very well. Over the years, Piekarski's responsibilities and salary increased, and in 1981, Piekarski was promoted to vice president of mortgage lending.
 
 
 3
 Despite Piekarski's ability in some areas, problems between Piekarski and his supervisors existed. Three to four years after Peterson hired Piekarski, Peterson became sufficiently disturbed by Piekarski's criticism of management that he requested Donley to act as a buffer between them. Tr. at 682-83. Piekarski's 1978 and 1979 annual written reviews criticized Piekarski for supporting employees rather than management. Pl.'s Ex. 31, 32. Piekarski's 1981 review contained written criticisms of his cooperation with management.[2] Pl.'s Ex. 33. When Donley took charge of the officer personnel files in 1982, he began to record specific instances of misconduct. Tr. at 486-87. Problems consistently noted were tardiness and failure to respond adequately to supervisors' requests. See Pl.'s Ex. 34-47, 50. For instance, tellers complained that, contrary to a management policy requiring officers assigned to evening supervision to stay near the tellers, Piekarski would work in his office located on a different level of the building. Tr. at 628-30. Tellers also complained that Piekarski failed to show up on time for two successive Saturday shifts and had to be called at home. As a result, the bank did not open on time and customers had to wait. Tr. at 625-28. Testimony also showed that not only did Piekarski often criticize management's decisions, he discussed his criticisms with the staff in his department. Tr. at 441-43, 604, 852, 866, 1085, 1124-28. His supervisors were aware of this practice, and believed that it engendered employee dissatisfaction and friction between departments. Tr. at 155, 300, 681, 908, 1013-14, 1129-30. As early as November 1982, Donley placed a note in Piekarski's file stating that he was "not convinced that [Piekarski was] doing his job." Pl.'s Ex. 36.
 
 
 4
 Piekarski was aware of management's dissatisfaction. Piekarski testified that Donley had brought many of the above problems to his attention. Tr. at 260-78. According to a 1982 note in Piekarski's file, Piekarski told Donley that he felt he was being unfairly criticized. Pl.'s Ex. 36. In the spring of 1983, Piekarski scheduled a meeting with the chairman of the board because he perceived friction between management and himself. Tr. at 247. In January 1984, Piekarski was passed over for a promotion. Tr. at 902, 906.
 
 
 5
 Despite this ongoing conflict between Piekarski and management, Home Owners continued to employ Piekarski. In late 1987, however, Knutson Mortgage Corporation's pending acquisition of Home Owners motivated Donley to tell vice presidents, Jeffrey Vye and David Leabo, that he sought to go forward with "the strongest, most cooperative staff possible." Tr. at 1200. On January 26, 1988, Vye, Piekarski's immediate supervisor, and Leabo told Piekarski that he was being terminated because of corporate restructuring.[3] In fact, the "restructuring" that occurred involved only a change in personnel. Piekarski's position was not eliminated. Vye testified that the reason for informing Piekarski that his termination was a result of corporate restructuring rather than poor job performance was because it was easier, and provided Piekarski with a better chance of obtaining new employment. Tr. at 914. Whether it was Donley or Vye that actually recommended discharging Piekarski is disputed.
 
 
 6
 As a result of this discharge, Piekarski filed an action against Home Owners and Donley. Piekarski's action included claims for breach of a "for cause" employment contract, retaliatory discharge, misrepresentation, and tortious interference with contract. This case originally began in Minnesota state court where the judge scheduled a bifurcated trial on liability and damages and then presided over the liability phase. Upon the close of testimony, the court submitted special interrogatories to an advisory jury regarding Piekarski's claims of breach of employment contract, retaliatory discharge, and tortious interference with contract. The jury returned a verdict of liability on all three claims. The court adopted this verdict and also found Donley liable on the remaining claim of misrepresentation and for punitive damages. Piekarski v. Home Owners Sav. Bank, F.S.B., 752 F.Supp. 1451, 1458-59 (D.Minn.1990) (Minnesota state court opinion attached at Appendix A). Before the state court could reach the damages phase of the trial, however, the Resolution Trust Corporation became conservator of Home Owners' parent corporation and removed the case to federal court.[4] Minnesota federal district court thus held the damages phase of the trial. The court found Home Owners and Donley jointly liable for $120,000 in damages to date of trial and $35,000 in lost future earnings. The court also found Donley liable for $25,000 in punitive damages. Finally, the court awarded Piekarski $152,564.50 in attorneys' fees and $10,307.07 in costs.
 
 II.
 
 7
 Home Owners and Donley now appeal both the state court's findings on liability and the federal court's findings on damages. They essentially argue that there was insufficient evidence to support a finding of liability on any of the claims. Because we are reviewing state court claims, the appropriate standard for review is that applied by Minnesota appellate courts. Thus, this court should uphold the trial court's findings of fact unless they are clearly erroneous. Minn.R.Civ.P. 52.01. A finding is clearly erroneous if this court is left with a firm and definite conviction from a review of the entire record that a mistake has been made. City of Minnetonka v. Carlson, 298 N.W.2d 763, 766 (Minn.1980). When applying the facts to the legal requirements, however, this court need not defer to the trial court's conclusions. Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349, 354 (Minn.1977). A thorough review of the entire record leaves us convinced that Piekarski did not sustain his burden of proof on any of his claims. We will discuss each of these claims in turn.
 
 A. Breach of Employment Contract
 
 8
 It is undisputed that Piekarski was hired for an indefinite term, had no written employment contract, and could have left Home Owners at any time. Generally speaking, an employer can terminate such a relationship at any time and without good cause. Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 882 (Minn.1986). Piekarski, however, alleges that Home Owners' personnel policies and numerous representations made to him created an implied, unilateral employment contract that modified this relationship. Specifically, Piekarski alleges that Home Owners could terminate him only for good cause and with fair warning. The state trial court agreed, and found that Home Owners and Donley had breached this contract.
 
 
 9
 On appeal, Home Owners and Donley argue that a federal regulation preempts state contract law, and thus precludes a finding of a "for cause" employment contract between Home Owners and Piekarski. This regulation requires that all employment contracts between savings associations and its officers be in writing and approved by the association's board of directors. 12 C.F.R. § 563.39(a) (1991) (first enacted in 1982). This preemption argument involves a choice of law--does federal regulatory law or Minnesota state law govern the creation of an employment contract. Where preemption involves a choice of law, rather than a choice of forum, it is an affirmative defense. E.g., Dueringer v. General Am. Life Ins. Co., 842 F.2d 127, 130 (5th Cir.1988); Gilchrist v. Jim Slemons Imports, Inc., 803 F.2d 1488, 1496-97 (9th Cir.1986). Under Minnesota Rule of Civil Procedure 8.03, failure to plead an affirmative defense constitutes waiver of the defense. Neither Home Owners nor Donley pled preemption. In fact, they did not even raise the issue until posttrial motions. Appellants thus waived this defense.
 
 
 10
 Alternatively, Home Owners and Donley argue that Piekarski failed to prove a modification of his at-will contract. In Minnesota, an employer creates an implied employment contract of unspecified duration and with discharge limited to good cause if: (1) it communicates to the employee a definite offer of "for cause" employment; and (2) the employee accepts the offer and furnishes consideration. E.g., Pine River State Bank v. Mettille, 333 N.W.2d 622, 626 (Minn.1983). The employee's retention of employment, when free to leave, constitutes acceptance of the offer and the necessary consideration.[5] Id. at 627. Because Piekarski continued to work for Home Owners until he was fired, the only issue is whether Home Owners communicated a definite offer of "for cause" employment to Piekarski. When determining whether an employer has made such an offer, the outward manifestations of the employer's agents, rather than their subjective intent, are controlling. Id. at 626. We find no evidence that a definite offer of "for cause" employment was communicated to Piekarski.
 
 
 11
 Initially, we reject Piekarski's argument that the job security representations made to him constituted definite offers of "for cause" employment. These representations consisted of a statement by Peterson, then president of Home Owners, that the mortgage loan officer position was a position with a "future," Pl.'s Ex. 3, and a statement in a letter from Peterson to all officers that his "goal for each of the officers and employees of this association is job security." Pl.'s Ex. 11, 95, 107. Piekarski also testified that he was under the impression that he had job permanence, but did not testify to ever having been told this. Tr. at 83. Even if he had, however, the rule in Minnesota is that general statements regarding job permanence and job security are not definite offers. Pine River State Bank, 333 N.W.2d at 627; Harris v. Mardan Business Sys., Inc., 421 N.W.2d 350, 354 (Minn.App.1988). For example, Minnesota courts have found, as a matter of law, that the following statements were not offers: employee told he had a great future with the company and to consider his job a career situation, Degen v. Investors Diversified Servs., Inc., 260 Minn. 424, 110 N.W.2d 863, 865-66 (1961); employee handbook stated that "[employer] seeks to ensure the job security of all salaried employees," Lewis, 389 N.W.2d at 883; employee repeatedly told by employer that they would retire together, Dumas v. Kessler & Maguire Funeral Home, 380 N.W.2d 544, 547 (Minn.App.1986); employee told that employer would always take care of him, and that he was a lifetime sales representative, Aberman v. Malden Mills Indus., 414 N.W.2d 769, 771-72 (Minn.App.1987). The statements made to Piekarski were no more specific than these representations.
 
 
 12
 We also conclude that the Home Owners' by-law Piekarski relies on to support his contract claim does not constitute a definite offer of "for cause" employment. This by-law provides: "Any officer may be removed by the board of directors whenever in its judgment the best interests of the association will be served thereby, but such removal, other than for cause, shall be without prejudice to the contractual rights, if any, of the person so removed." Pl.'s Ex. 29 (emphasis added). This simply means that if an officer has certain contract rights, and that officer is removed without cause, the officer's contract rights are not prejudiced. The by-law cannot be read as giving officers the contractual right to be fired only for cause and after notice. See Gates Rubber Co. v. Porwoll, 395 N.W.2d 92, 96-97 (Minn.App.1986) (holding that a written termination policy that discussed the severance benefits of employees that were terminated for cause, but not of employees that were terminated without cause, was legally insufficient to constitute an offer of "for cause" employment).
 
 
 13
 Additionally, we reject Piekarski's argument that successful completion of a probationary period constitutes a definite offer of "for cause" employment. Although no Minnesota court has expressly addressed the impact of a probationary period on at-will employment, the Minnesota Supreme Court has implicitly rejected this argument. In Pine River State Bank, the court noted in its factual discussion that the plaintiff-employee had "survived his 6-month probationary period," but its discussion of whether a "for cause" employment contract existed did not even mention this fact. 333 N.W.2d at 624; see also Johnston v. Panhandle Co-op Ass'n, 225 Neb. 732, 408 N.W.2d 261, 265-66 (1987) (holding that a handbook provision providing for permanent employment after completion of a probationary period was not a definite offer). Moreover, testimony shows that all Home Owners' employees initially had a probationary period. Tr. at 681-82, 1081. If we were to accept Piekarski's argument, Home Owners would not have a single at-will employee.
 
 
 14
 Piekarski's evidence that Home Owners had a policy of discharging employees only for cause and after notice also is legally insufficient to modify his at-will employment. Piekarski introduced evidence that Donley "built files" on employees, that Home Owners had cause when it terminated two other officers, and that one of these officers had been given a warning before he was fired. Additionally, both the personnel director and the chairman of the board testified that employees generally are not fired except for cause. The problem with this evidence is that, even assuming it demonstrated a "for cause" policy, Piekarski introduced absolutely no evidence that anyone at Home Owners ever told him, either orally or in writing, that it was Home Owners' policy to discharge employees only for good cause and after notice. Tr. at 111, 297. Numerous Minnesota cases have held that even though an employer has a policy limiting discharge to good cause and even though the employee had knowledge of that policy, there is no employment contract unless the employer communicated the policy to the employee.[6] Cederstrand v. Lutheran Bhd., 263 Minn. 520, 117 N.W.2d 213, 221-22 (1962), Makhsoos v. Minnesota Mining & Mfg. Co., No. C5-89-2080, 1990 WL 92850, at * 3 (Minn.App. July 10, 1990) (unpublished); see also Pine River State Bank, 333 N.W.2d at 626 (contract exists only if handbook language constitutes an offer and "the offer has been communicated by dissemination of the handbook to the employee"); cf. Skramstad v. Otter Tail County, 417 N.W.2d 124, 126 (Minn.App.1987) (no implied, unilateral contract regarding employee's sick leave because no evidence that policy ever provided to him as part of an offer); Tobias v. Montgomery Ward & Co., 362 N.W.2d 380, 382 (Minn.App.1985) (written meals allowance policy did not create unilateral contract because not communicated to employee).
 
 
 15
 Finally, Piekarski argues that the trial court properly relied on circumstantial evidence to support its finding of a "for cause" employment contract. Specifically, the court stated that the officers' annual appointment, annual salaries, and annual reviews were inconsistent with an at-will relationship. Not only is this assumption erroneous, this evidence cannot prove the existence of a "for cause" employment contract. A necessary element of such a contract is communication of a definite offer to the employee. If the employee never produces any evidence that such an offer was made, not even his own testimony, he cannot prove the existence of the contract solely through circumstantial evidence.[7] Because Piekarski has not offered any evidence that we can construe as a definite offer of "for cause" employment, his claim for breach of contract must fail.
 
 
 16
 B. Retaliatory Wage Discrimination[8] and Discharge
 
 
 17
 Piekarski also claims that Home Owners and Donley subjected him to retaliatory wage discrimination and discharge, in violation of both statutory and common law. This claim stems from Piekarski's involvement in a mortgage loan that Home Owners made to the buyers of a house owned by Donley's parents. Piekarski became embroiled in a dispute between Donley's parents and the buyers of their home over the amount Donley's parents should pay for a septic system upgrade required by the FHA before it would insure the buyers' mortgage loan. The buyers eventually sued Donley's parents, and Piekarski was subpoenaed. Approximately three years later, Piekarski was discharged.
 
 
 18
 At the time of his discharge, Minnesota Statute § 181.932(1)(c)[9] prohibited employers from discharging or otherwise penalizing an employee because:
 
 
 19
 (c) the employee refuses to participate in any activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law.
 
 
 20
 Minn.Stat.Ann. § 181.932 (Supp.1992) (Historical and Statutory Notes).[10] Piekarski alleges that Donley penalized him because: (1) he refused to either commit perjury at the trial involving Donley's parents or avoid the subpoena; and (2) he refused to violate FHA regulations requiring Donley's parents to escrow money for the septic system upgrade. We find both of these allegations completely without merit.
 
 
 21
 As to Piekarski's first allegation, we find no basis in the record for concluding that Donley wanted Piekarski to either perjure himself at the trial or avoid the subpoena. Piekarski does not even allege that Donley expressly requested such action. Rather, Piekarski claims that this request was implicit in the "stern, disapproving look" Donley gave him when Piekarski showed him the subpoena on the day of trial. Even assuming an implied request is sufficient, we find it clearly erroneous to conclude that Donley's "stern look" was a demand that Piekarski break the law in order to save his parents approximately $1000.[11] Piekarski introduced no evidence that Donley supported his parents' position in the lawsuit. In fact, the record indicates that Donley thought his parents' position was unsound--Donley told the buyers' attorney that he thought his parents were getting bad advice from a third party. Tr. at 405; Pl.'s Ex. 56. Additionally, there was no evidence that Donley had ever told Piekarski, either directly or indirectly, that he should help his parents avoid paying for the septic system upgrade. Piekarski admitted that when Donley had previously threatened to "ask for Piekarski's job," Donley's anger stemmed from the fact that Piekarski had involved him in his parents' transaction even though he had requested that he be kept out of it. Tr. at 321-24. Finally, Piekarski offered no evidence that Donley even attempted to determine how Piekarski actually testified at trial--a trial which resulted in no clear winner or loser.
 
 
 22
 In response to this lack of evidence, Piekarski argues that it does not matter whether Donley actually wanted him to commit perjury, so long as he had a good faith belief that this is what Donley wanted. We reject this argument. See Merkel v. Scovill, Inc., 573 F.Supp. 1055, 1063-64 (S.D.Ohio 1983) (employer must have actually wanted employee to commit perjury, employee's belief is not relevant). An employee cannot refuse to take action his employer has not requested he take. See Hamann v. Gates Chevrolet, Inc., 723 F.Supp. 63, 65-66 (N.D.Ind.1989) ("[plaintiff] cannot be said to have refused to perform an illegal act, since she had not been requested to do anything illegal ..."), aff'd, 910 F.2d 1417 (7th Cir.1990). Additionally, if an employer did not want the employee to take certain action in the first place, the employee's refusal to do so could never be cause for adverse employment action.
 
 
 23
 Piekarski's second allegation--that Donley discharged him for refusing to violate FHA regulations--also is without merit. The only specific FHA requirement Piekarski points to provides as follows:
 
 
 24
 MORTGAGEE'S ASSURANCE OF COMPLETION FOR DEFERRED ON-SITE IMPROVEMENTS. To facilitate the insurance of home mortgages before the completion of on-site improvements, HUD-FHA recognizes assurance of completion submitted on FHA Form 2300, Mortgagee's Assurance of Completion. An assurance of completion using FHA Form 2300 must be supported by an escrow of cash or a commercial letter of credit.
 
 
 25
 Pl.'s Ex. 23. This provision required an escrow account only if Home Owners, through the use of Form 2300, wanted to obtain insurance on the buyers' loan prior to the completion of the septic system upgrade. It does not prohibit Home Owners from simply making the loan and obtaining the FHA insurance when the upgrade was later completed, which is apparently what occurred here.[12] Piekarski points to no other regulation requiring the establishment of an escrow account. Thus, even if Donley told Piekarski not to set up an escrow account, as Piekarski claims, this was not a request to violate the law. Moreover, even assuming that Piekarski had a good faith belief that failure to establish an escrow account did violate the law, Piekarski did not refuse Donley's request that he not set one up. Rather, he complied with Donley's request to let his parents leave their money in an interest-bearing account. Thus, Piekarski failed to establish the elements of his statutory retaliatory discharge claim.[13]
 
 
 26
 In addition to his statutory claim, Piekarski argues that Donley's retaliatory actions violated the common law. We reject Piekarski's common law claim for retaliatory wage discrimination occurring after August 1, 1987, and retaliatory discharge occurring in 1988. Minnesota courts have not recognized a common law action for discharge based on refusal to violate the law that exists independently of the action under Minnesota Statute § 181.932(1)(c). Maida v. Maxi-Switch Co., No. CO-88-1344, 1989 WL 452, at * 2 (Minn.App. Jan. 10, 1989); see also Steinbach v. Northwestern Nat'l Life Ins. Co., 728 F.Supp. 1389, 1394 (D.Minn.1989) (finding that Minnesota does not recognize a general common law claim for wrongful discharge and rejecting plaintiff's claim because it duplicated a statutory claim). Once the Minnesota legislature has drawn the line between employment disputes that genuinely implicate public policy and are actionable and those that are not, it is not for courts to redraw that line.
 
 
 27
 We do believe, however, that Piekarski has a common law action for retaliatory wage discrimination occurring prior to enactment of the above statute in August 1987. In Phipps v. Clark Oil & Refining Corp., 408 N.W.2d 569, 571 (Minn.1987), the Minnesota Supreme Court held that an at-will employee who was terminated in 1984 for refusing to violate the law had a common law action for wrongful discharge. The court relied on the Minnesota legislature's enactment of Minnesota Statute § 181.932(1)(c), discussed above, to support its conclusion. Id. Additionally, the court incorporated the requirements of this statutory action into the common law action. Id. Although this case involved a retaliatory discharge, we believe that the Minnesota Supreme Court would extend the common law claim to retaliatory wage discrimination occurring prior to August 1987. We do not believe, however, that Piekarski has established that the wage difference between himself and another vice president was in retaliation for his refusal to violate the law. As noted above, it is completely unreasonable to believe that Donley requested Piekarski to commit perjury or avoid the subpoena, and Piekarski never refused to violate any FHA regulations. See McIntire v. State, 458 N.W.2d 714, 720-21 (Minn.App.1990) (dismissing common law wrongful discharge claim because plaintiff never asked to violate the law), cert. denied, --- U.S. ----, 111 S.Ct. 970, 112 L.Ed.2d 1056 (1991). Accordingly, Piekarski's common law action for wage discrimination must fail.
 
 C. Misrepresentation
 
 28
 Piekarski's third claim is that statements made to him by Donley regarding his job security constituted fraudulent misrepresentation. Under Minnesota law, a successful claim of fraudulent misrepresentation requires proof of the following elements: a false representation of past or present material fact that is susceptible to knowledge; the representor knew the fact was false or asserted it as her own knowledge without knowing whether it was true or false; the representor intended that the plaintiff act on the statement; the plaintiff, in fact, acted in justifiable reliance on the statement; the plaintiff suffered damage; and the statement was the proximate cause of this damage. See, e.g., Florenzano v. Olson, 387 N.W.2d 168, 174 n. 4 (Minn.1986).
 
 
 29
 Our review of the record convinces us that the trial court was clearly erroneous in finding misrepresentation liability. The trial court relied on two alternative groups of statements as its basis for finding liability. The first group consists of statements made to Piekarski regarding his job performance. This group does not contain a single false representation of past or present fact. The trial court specifically cited to Piekarski's 1978, 1979 and 1981 annual reviews which indicated that his overall performance was good, although there were problems in specific areas. The evidence shows that these reviews accurately reflected management's perception of Piekarski at the time. The court also cited to letters Piekarski received disclosing his annual salary increase.[14] Piekarski, 752 F.Supp. at 1469 (citing to Pl.'s Ex. 4-6, 28A, 28C, 28D). These letters made general statements such as "[y]our 1986 efforts on behalf of our Association are appreciated." Pl.'s Ex. 28D. Simply because Donley was dissatisfied with aspects of Piekarski's performance does not mean that he did not appreciate Piekarski's efforts. Even assuming these statements were false, however, Piekarski cannot prove that he justifiably relied on them. There is undisputed evidence that Piekarski knew that management was dissatisfied with aspects of his performance. See, e.g., Tr. at 143, 260-78. For example, a note in Piekarski's file indicated that he had complained about his 1987 salary and Donley had responded that it was a result of his past attitude and performance. Pl.'s Ex. 47; see also Tr. at 169 (Piekarski complained about 1986 salary).
 
 
 30
 The second group of statements the trial court relied on consists of statements made in 1987 regarding the impact of Knutson's acquisition on employees' job security.[15] This group arguably contains false representations of past or present fact. Specifically, Donley told employees that he would do his best to see that as many people as possible "went forward" with Home Owners after the Knutson acquisition. Tr. at 175-77, 301-02, 1242. Under Minnesota law, a promise of a future act can constitute a misrepresentation if the promisor had no intent to perform at the time the promise was made. Vandeputte v. Soderholm, 298 Minn. 505, 216 N.W.2d 144, 147 (1974). The trial court could have found that Donley intended to fire Piekarski when he made these statements. Assuming this is true, however, we find it unreasonable for Piekarski also to argue that Donley intended Piekarski to rely on these statements. It is highly unlikely that Donley would encourage Piekarski to continue his employment at Home Owners when he wanted to fire him. Additionally, we do not believe that Piekarski could justifiably rely on these statements. Not only was Piekarski well aware of Donley's dissatisfaction with his performance, Donley made these statements at general employee meetings--not directly to Piekarski. Tr. at 301-02. Finally, Piekarski introduced no evidence of detrimental reliance. These representations occurred in the last six months of Piekarski's employment. During this time, Piekarski did not decline pending job offers or pass up a concrete opportunity to look for other jobs.[16] Cf. Dumas, 380 N.W.2d at 548 (plaintiff must turn down other offers of employment to establish the detrimental reliance required for a promissory estoppel claim). Although Piekarski did continue to work for Home Owners, he introduced no evidence that Donley's statements were a substantial factor in his remaining on the job or that his remaining on the job was detrimental.
 
 
 31
 In addition to the statements relied on by the trial court, Piekarski points to two more statements that supposedly justify misrepresentation liability: Donley's response to Piekarski's complaints about his 1986 salary was "I guess it just depends on where we place our emphasis," Tr. at 169, and Donley's response to Piekarski's inquiry as to how he could increase his 1987 salary was "the association w[ill] have to make more money." Tr. at 171. Given Piekarski's knowledge about management's dissatisfaction with him, he certainly could not justifiably rely on these vague statements. In fact, Piekarski testified that he did not even understand what was meant by the latter statement. Tr. at 171.
 
 
 32
 To further support a finding of misrepresentation liability, both Piekarski and the trial court emphasized Donley's failure to tell Piekarski that he was recording complaints in Piekarski's personnel file. A failure to disclose a material fact can constitute misrepresentation only if the defendant has a duty to disclose. Stowman v. Carlson Cos., 430 N.W.2d 490, 493 (Minn.App.1988). An employer has no duty to disclose to an employee that he has placed items in his file. See Hurley v. TCF Banking & Sav., 414 N.W.2d 584, 587-88 (Minn.App.1987) (no duty to disclose unless official or fiduciary relationship exists); cf. Stowman, 430 N.W.2d at 493 (potential employer has no duty to disclose to a job applicant negotiations to sell the company). It would be incongruous to give employers the right to fire an at-will employee without warning, but to require employers to tell an employee every time they placed a note in his or her personnel file. Because Piekarski has not proven either justifiable reliance on a false statement or a duty to disclose, it is clearly erroneous to find Donley liable for fraudulent misrepresentation.[17]
 
 D. Tortious Interference with Contract
 
 33
 Piekarski's final claim is that Donley tortiously interfered with the contractual relationship between himself and Home Owners. Although we concluded that Piekarski was an at-will employee, the Minnesota Supreme Court recently held that a tortious interference claim will lie for an at-will employment agreement. Nordling v. Northern States Power Co., 478 N.W.2d 498, 504-505 (Minn.1991). A party, however, cannot interfere with its own contract. Id. Thus, if Donley was acting within the scope of his Home Owners' duties when he terminated Piekarski, his actions are those of the association and he cannot be liable for tortious interference. We find that Donley, as president, had the power to discharge employees of Home Owners.[18] Despite this fact, Donley was not acting within the scope of his employment if his decision to fire Piekarski was motivated by actual malice.[19] Id. at 506. Piekarski has the burden of proving actual malice. Id. The Minnesota Supreme Court has defined actual malice as bad faith, personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff. Id. at 506. It does not include actions taken with a good faith belief, whether valid or not, that they will further the company's business. Id.
 
 
 34
 We find no evidence in the record that Donley fired Piekarski because he sought to injure him or Home Owners. In fact, the record indicates that Donley considered Piekarski a negative influence at Home Owners, and thought that his removal would benefit the company. Although the personality conflict between Piekarski and Donley also could have prompted the termination, we find that this motive does not rise to the level of actual malice unless the reason for the personality conflict would give the employee a claim against the employer for wrongful discharge.[20] To hold otherwise would severely limit the doctrine of employment at will. Minnesota has long held that, with limited exceptions, an employer can discharge an at-will employee for any reason or no reason. E.g., Phipps v. Clark Oil and Refining Corp., 396 N.W.2d 588, 590 (Minn.App.1986); Minn.Stat. §§ 181.932, 363.03(7) (1990). The exceptions prohibit an employer from discharging an employee in certain circumstances or for certain reasons. There is no exception to the employment-at-will doctrine that prohibits Piekarski from firing Donley because of a personality conflict stemming from Piekarski's tendency to criticize and disagree with Donley. And, as previously noted, it is unreasonable to conclude that the problems between Donley and Piekarski stemmed from Piekarski's refusal to violate the law. Thus, Donley, as Home Owners' president, could fire Piekarski because of their personality conflict without tortiously interfering with the contract between Piekarski and Home Owners.
 
 III.
 
 35
 Because we are overturning the trial court's finding of liability on all claims, it is not necessary to address the damages issues.
 
 CONCLUSION
 
 36
 In conclusion, we reverse the trial court's finding of liability on all claims. Although Donley may have lacked "good cause" to fire Piekarski, Minnesota is an employment-at-will state. Thus, neither a court nor a jury can second guess Donley's decision unless Piekarski has proven all the elements of a recognized cause of action. Piekarski simply has failed to do this.
 
 
 
 *
 THE HONORABLE DANIEL M. FRIEDMAN, Senior United States Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 Piekarski challenges Donley's appeal on the basis that he did not file a notice of appeal within 30 days of judgment. See Fed.R.App.P. 3(c). Specifically, Piekarski argues that although Home Owners and Donley filed a Notice of Appeal within 30 days, it was ineffective as to Donley because it listed him as "et al." rather than by name. See, e.g., Torres v. Oakland Scavenger Co., 487 U.S. 312, 318, 108 S.Ct. 2405, 2409, 101 L.Ed.2d 285 (1988). We reject this argument because attached to this Notice of Appeal was Appellant's Information Form A, which unambiguously listed Donley as a party appealing the final judgment. The Eighth Circuit has recently ruled that when a collateral document naming the specific parties is filed within the required time, the document serves as the "functional equivalent" of a notice of appeal, and jurisdiction over the parties exists. See Good Samaritan Hosp. v. Sullivan, 952 F.2d 1017, 1021-23 (8th Cir.1991)
 
 
 [2]
 There was not a 1980 written review
 
 
 [3]
 Donley did not tell Piekarski himself because he was recovering from a recent heart attack and was under doctor's orders to avoid stressful situations
 
 
 [4]
 For a more thorough discussion of this case's procedural history, see Piekarski v. Home Owners Savings Bank, 743 F.Supp. 38 (D.D.C.1990)
 
 
 [5]
 Even when the employer has not made a definite offer of "for cause" employment, an employee may create an implied "for cause" employment contract by providing consideration beyond personal employment services. See, e.g., Bussard v. College of St. Thomas, Inc., 294 Minn. 215, 200 N.W.2d 155, 161 (1972). Piekarski does not assert that he provided any consideration beyond his personal employment services. See Corum v. Farm Credit Servs., 628 F.Supp. 707 (D.Minn.1986) (holding that job specialization and foregoing other employment opportunities did not constitute the required consideration)
 
 
 [6]
 For this reason, Home Owners' statements to Knutson Mortgage indicating that all officers would continue in their same capacities after Knutson acquired Home Owners also are legally insufficient to form a "for cause" contract
 
 
 [7]
 We are not saying that circumstantial evidence is never relevant. Certainly, if there is conflicting testimony over whether an offer was made, circumstantial evidence that a contract existed would support the plaintiff's credibility. In this case, however, there is no credibility issue
 
 
 [8]
 Although the state court did not make a specific finding of wage discrimination, the federal court awarded Piekarski damages for wage disparity beginning in 1984. Piekarski, 752 F.Supp. at 1454
 
 
 [9]
 Because this statute did not take effect until August 1, 1987, Minn.Stat. § 645.02 (1990), and was not retroactive, Minn.Stat. § 645.21 (1990), Piekarski has a statutory wage discrimination claim only for the time beginning in August 1987, and ending in January 1988, with his discharge
 
 
 [10]
 This statute was amended in 1988. See Minn.Stat. § 181.932(1)(c) (1990). Because "[n]o law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature," Minn.Stat. § 645.21, and no such statement accompanied this amendment, the 1987 version of this provision applies to Piekarski's action
 
 
 [11]
 The record does not indicate the actual amount in dispute in this lawsuit. The buyers sought to collect approximately $2300. It is unclear what Donley's parents thought they should pay. Their own testimony is that they were willing to pay the original estimate of $1600 for the upgrade. Piekarski, however, testified that at one point they felt they shouldn't pay over $900, and maybe not even that. Tr. at 134. Thus, the disputed amount was apparently somewhere between $700 and $1400
 
 
 [12]
 There was no evidence that Form 2300 was used. Indeed, given that no escrow account was ever established, Piekarski could not have used Form 2300
 
 
 [13]
 Because we conclude that Piekarski failed to establish a request and a refusal to violate the law, we need not fully address the element of causation. We note only that the evidence connecting Piekarski's involvement in Donley's parents' transaction with his discharge is extremely weak. There was uncontradicted evidence that management had problems with Piekarski long before this transaction ever arose, and that these same problems continued up until Piekarski's discharge more than three years after the transaction
 
 
 [14]
 Some of these letters, Pl.'s Ex. 4-6, 28C, were not even from Donley, and certainly cannot be the basis for holding Donley liable for misrepresentation liability
 
 
 [15]
 Some of these statements cannot constitute grounds for misrepresentation liability because they were not made to Piekarski. See Piekarski, 752 F.Supp. at 1470 (citing to Pl.'s Ex. 78, 80)
 
 
 [16]
 Piekarski generally testified that in the mid-1980s, prior to discussions about the Knutson acquisition, a couple of other employers had contacted him about job opportunities. Tr. at 112, 335. The only specific evidence introduced regarding alternative employment for Piekarski was that a year to 18 months prior to his termination, he sought a position at another bank. Tr. at 1131
 
 
 [17]
 We also reject Piekarski's claims of negligent and reckless misrepresentation. For purposes of this opinion, it is not necessary to discuss all the intricacies of these claims. We simply note that Piekarski's failure to prove justifiable reliance on a false statement is fatal to these claims
 
 
 [18]
 Piekarski argues that only the board had the power to discharge him. We find no evidence to support this. A Home Owners' by-law provides that "officers shall have such authority and perform such duties as the board of directors may from time to time authorize or determine. In the absence of action by the board of directors, the officers shall have such powers and duties as generally pertain to their respective offices." Pl.'s Ex. 29. Every board member that testified stated that Donley, as president, had the power to fire subordinate officers. Tr. at 744, 825-26; see also Tr. at 676 (testimony of ex-president Peterson). Although the evidence showed that the board was required to ratify the officers for each year, Tr. at 549, there is no dispute that the board ratified the officers for 1988, and that these officers did not include Piekarski. Tr. at 547
 
 
 [19]
 Although it is highly disputed whether Donley made the decision to fire Piekarski, for purposes of this section, we assume he did
 
 
 [20]
 For example, if Piekarski had established that the reason Donley did not like him was because he refused to perjure himself at Donley's parents' trial, Piekarski may have proven that actual malice motivated Donley's interference with his employment contract