# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-2648

_____

James Aulick

*Plaintiff - Appellant*

v.

Skybridge Americas, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 8, 2017
Filed: June 19, 2017

_____

Before WOLLMAN, MELLOY, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

James Aulick asserts that his former employer, Skybridge Americas, Inc., denied him a promotion and ultimately terminated his employment because of his age, in violation of state and federal law. Aulick also contends that Skybridge both fraudulently and negligently misrepresented to him that he would receive the

promotion. The district court,[1] however, granted Skybridge's motion for summary judgment and dismissed these claims. We now affirm.

## I.

In reviewing the district court's grant of summary judgment, dismissing Aulick's claims, we view the facts in the light most favorable to Aulick. See Oehmke v. Medtronic, Inc., 844 F.3d 748, 750 (8th Cir. 2016). Skybridge is a retail order fulfillment business. It consists of two divisions: (1) a warehouse and distribution business that fulfills orders, and (2) a call center business. Skybridge bought these two divisions from their previous owner, Argenbright, in 2011. The call center division employs about 700 people and accounts for more than 75% of Skybridge's business, while the fulfillment division employs less than 50 people and accounts for less than 25% of the Skybridge's business.

James Aulick is an experienced and credentialed information technology ("IT") professional. In addition to his sciences degree he has an MBA and multiple professional credentials. At points in his career he has managed IT staffs with over 70 employees for retail corporations. When Skybridge bought the fulfillment and call center businesses, Aulick, then 61 years old, was serving as senior director of IT for the fulfillment business. After the purchase, Skybridge hired Aulick as senior IT director of fulfillment with an at-will employment contract. He had no experience with the call center business.

Over the next two years, Skybridge's CEO and sole shareholder Mark Morris hired six new people to serve in executive roles. Three were age 57 or older, one was

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

60, one 47, and another 35. Kevin Cattoor, 57, was one of these hires, becoming CEO of Skybridge in November 2011.

In September 2012, Cattoor submitted a memorandum summarizing his views on the fulfillment division's performance and areas of needed improvement. Cattoor wrote that "IT management is not optimum." He further stated that Aulick "is not capable of leading IT projects"; Aulick "has not effectively established IT priorities, work plans, communicated the plan to those who will be involved with the project . . . and updated everyone on the status of projects." Cattoor mentioned "numerous discussions" with Aulick centered on improving communication and leadership skills. Cattoor also noted a longstanding lack of confidence "in the IT department's ability to get things done effectively." Cattoor thus concluded his assessment of Aulick: "We need to continue to work with Jim to overcome his shortcomings. At the same time we should be exploring other alternatives for management of IT."

Around the same time, Aulick had grown increasingly frustrated with Skybridge's executive team. He believed Skybridge's IT department was underfunded and understaffed. In October 2012, Aulick informed Cattoor of his intention to look for another job if the situation continued. The two men also discussed a need for a centralized IT department headed by one Chief Information Officer. Cattoor reported this conversation to Morris, who replied that it would be "unfortunate if Mr. Aulick left while we were still evaluating our IT plan" for the company. In December, Aulick began his job search with a focus on Atlanta, Georgia; his wife had recently accepted a job there. Aulick interviewed with some potential employers but never actually received any offers of employment.

December 2012 saw new difficulties arise in the business relationship between Skybridge and Four Corners, one of Skybridge's most significant clients. Issues relating to IT infrastructure had previously arisen between Four Corners and

Skybridge's predecessor, Argenbright. Aulick had resolved those problems, so Skybridge assigned him to deal with Four Corners again.

In March 2013, an external audit of Skybridge was conducted by Dave Brady, a consultant. Skybridge spent a total of $17,000 on this audit. Brady met several times with Aulick, who provided information and shared his ideas on improving IT. Brady asked if Aulick's wife would move back to Minnesota if Aulick became head of a restructured IT department at Skybridge. Aulick replied, "Yes." Brady's final report to Skybridge's executive management recommended combining the separate IT departments—for the call center and fulfillment divisions—into one department headed by a new Chief Technology Officer. Brady considered Aulick to be a "strategic thinker" and the best internal candidate for the proposed CTO position. But Brady recommended Skybridge also consider external candidates. Skybridge then asked Brady if he would be interested in the CTO position; he declined.

Shortly thereafter, Cattoor and John Turner, Vice President of the fulfillment division, met with Aulick. Cattoor discussed the contents of Brady's report and informed Aulick that Brady had declined an offer to become CTO. Cattoor also told Aulick that Brady viewed Aulick as the sole current employee capable of performing as CTO. Cattoor then asked if Aulick was interested in applying for the position, and Aulick said he was interested. Cattoor responded, "Good. I'd be disappointed if you weren't." Going further, Cattoor said, "The job is yours to lose. You've got the inside track. Mark [Morris] really likes you." In Aulick's opinion, Cattoor was "laying it on thick." But, during this initial meeting, Cattoor plainly stated, "You're not guaranteed to get this position." The two men also discussed the application process and that the CTO position would be posted externally but not internally.

Because of Aulick's positive impression from the meeting, he ceased submitting any new applications for employment outside of Skybridge. One day Cattoor asked if Aulick had stopped his job search. After Aulick said he had stopped,

Cattoor replied, "Good." As a result of this conversation, Aulick took the additional step of withdrawing all of his pending applications.

In April 2013, Aulick formally interviewed for the CTO position with Cattoor and Turner. The three men spent over two hours discussing Aulick's resume and accomplishments. He was then told that he would have a future interview with Morris, and most likely another one with Michael Paxton, the sole member of Skybridge's advisory board. At no point did any Skybridge executive mention salary or a start date for the CTO position. Some weeks later, Cattoor said that Aulick's name "would be one of the two that [Cattoor] would talk to Morris about."

In May 2013, Aulick informed Cattoor that the IT issues between Skybridge and Four Corners had been resolved. Subsequently, Aulick heard from Cattoor with less frequency. Aulick assumed this resulted from Cattoor's frequent traveling.

Also in May, Brady introduced Bruce Whitmore to Skybridge as a candidate for the CTO position. Whitmore, then 50, was a former top-level IT manager who had most recently served as director of operations and CIO consultant for a private accounting and wealth management firm. He previously worked for Carlson Companies as senior director of infrastructure of that company's call center. Whitmore had a college degree in strategic management of information technology and several professional certificates. He also served in the United States Air Force for 11 years. Whitmore interviewed separately with Cattoor, Morris, and Paxton. One topic discussed was the proposed combination of fulfillment and call center IT. Whitmore related his experience at Carlson, which ran both a fulfillment operation and a call center.

While Whitmore was interviewing for the CTO position, Aulick "was still in the mix" for the position, according to Morris. Paxton, however, never knew that Aulick was a candidate and never interviewed any candidate other than Whitmore for

the CTO position. Ultimately, Whitmore was the choice for CTO. Skybridge extended an offer to him in early June, and he accepted shortly thereafter.

Cattoor spoke with Aulick privately in Aulick's office and informed him that Skybridge had made an offer to Whitmore. Cattoor intimated that Morris had made the decision because he wanted a "New Face." Cattoor repeated the phrase "New Face" four times in this conversation. Aulick would come to believe that "New Face" related to his age. Cattoor also asked whether Aulick planned to leave the company. Aulick replied, "[N]o, I'm waiting to see what [Whitmore] has in mind and how we could work together."

Later that month, Aulick presented his ideas for a new warehouse management system at a June 2013 company meeting. Morris approached Aulick after his presentation and said he was eager to start on Aulick's proposed project. Morris sent an email to Aulick on July 8th repeating this message.

On July 15, 2013, Cattoor met with Aulick and informed him that his position had been eliminated. Aulick was 63 years old at the time. Cattoor presented Aulick with an offer of 30 days' pay if he signed a severance agreement within 15 days. A human resources director called Aulick after only nine days and requested that Aulick sign the severance agreement. Aulick refused. Simultaneously, two other Skybridge employees were terminated because their positions had been eliminated. Both were over the age of 60. Moreover, Skybridge had terminated a 70-year-old employee in 2012 and replaced him with someone nearly 20 years younger.

Aulick's proposed project was never undertaken. From mid-2013 to mid-2015, Skybridge reduced the size of its IT department from 19 employees to 10 without any meaningful loss of productivity.

The record on appeal does not clearly show who at Skybridge made the decision to terminate Aulick. At their depositions, both Morris and Cattoor testified that Whitmore made the recommendation. Yet Whitmore testified that he played no role in Aulick's dismissal, nor did he recommend that Aulick's position be eliminated. In fact, Whitmore was surprised when Cattoor told him that Aulick had been terminated. After the depositions, Morris and Cattoor submitted declarations to the district court announcing that, in fact, the two of them oversaw Aulick's termination. Aulick remains unemployed.

Aulick brought a charge of discrimination with the United States Equal Employment Opportunity Commission and received a right-to-sue letter from the EEOC. Notice of intent to sue was also provided to the Minnesota Department of Human Rights. Aulick then filed suit in federal court and made five claims against Skybridge: (1) age discrimination in violation of both state and federal law; (2) violation of 29 U.S.C. § 626; (3) promissory estoppel; (4) fraud; and (5) negligent misrepresentation. Skybridge moved for summary judgment on all five counts, and the district court granted the motion. Aulick now appeals three of those claims: age discrimination, fraud, and negligent misrepresentation.

II.

An appellate court reviews a district court's grant of summary judgment de novo. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "We will uphold a grant of summary judgment 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Jerry's Enterprises, Inc. v. U.S. Specialty Ins. Co., 845 F.3d 883, 887 (8th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). We view the evidence, and all reasonable inferences taken therefrom, in the light most favorable to Aulick. See Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).

Aulick alleges two adverse employment decisions: (1) Skybridge hiring Whitmore rather than Aulick, and (2) Aulick's termination. These decisions, according to Aulick, were motivated by his age in violation of both the Minnesota Human Rights Act, Minn. Stat. § 363A.08, subd. 2, and the federal Age Discrimination in Employment Act, 29 U.S.C. § 621. Age discrimination claims brought under these statutes are analyzed under the same evidentiary framework, so we discuss the claims together. See Rahlf v. Mo-Tech Corp., 642 F.3d 633, 636 n.2 (8th Cir. 2011). "To establish a claim of intentional age discrimination, a plaintiff may present direct evidence of such discrimination or may prove his claim through circumstantial evidence." Carraher, 503 F.3d at 716.

A.

"[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Id. (internal quotation marks omitted). As an example, a decisionmaker's remark that "'women were the worst thing' that had happened to the company" is sufficient direct evidence of sex discrimination. See Stacks v. Sw. Bell Yellow Pages, Inc., 27 F.3d 1316, 1324 (8th Cir. 1994). But "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process" do not constitute direct evidence. Twymon v. Wells Fargo & Co., 462 F.3d 925, 933 (8th Cir. 2006) (internal quotation marks omitted). "Direct evidence does not include statements by decisionmakers that are facially and contextually neutral." Torgerson, 643 F.3d at 1045.

Aulick argued to the district court that Cattoor's repeated statement that Morris was looking for a "New Face" constituted direct evidence of age discrimination. The district court correctly rejected this argument. The comment about a "New Face" was facially and contextually neutral when made to Aulick. No reasonable fact finder

could hold otherwise.  Cf. Nash v. Optomec, Inc., 849 F.3d 780, 785 (8th Cir. 2017) (finding a comment "synonymous with 'new' . . . to be a textbook example of a 'stray remark' unrelated to the decisional process").

## B.

When a plaintiff, like Aulick, offers circumstantial evidence of illicit discrimination, we engage in the burden-shifting analysis set out by McDonnell Douglas Corp. v. Green.  See Carraher, 503 F.3d at 716.  "Under McDonnell Douglas, the plaintiff must first establish a prima facie case of discrimination."  Id. at 717.  If the plaintiff succeeds, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Id.  If the employer meets this burden, then the plaintiff "must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Girten v. McRentals, Inc., 337 F.3d 979, 982 (8th Cir. 2003) (internal quotation marks omitted).

To establish his prima facie case, Aulick must show he: (1) was at least 40 years old; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was rejected for someone sufficiently younger to permit the inference of age discrimination.[2]  See Ramlett v. E.F. Johnson Co., 507 F.3d 1149, 1153 (8th Cir. 2007).  The first three elements are easily met:  Aulick was 63 years old when terminated, he was qualified for the CTO position, and he was not selected for promotion and was ultimately terminated.  The parties debate whether the 13-year age difference between Aulick and Whitmore permits an inference of age discrimination.

---

[2]This fourth element pertains primarily to Aulick's claim that he was denied a promotion because of his age.  Under his wrongful termination claim, since his position was eliminated, he must show that "there is some additional evidence that age was a factor" in his termination.  See Ward v. Int'l Paper Co., 509 F.3d 457, 460 (8th Cir. 2007).

However, we assume without deciding that Aulick has met his burden and established a prima facie case for age discrimination. See Girten, 337 F.3d at 981 (assuming that the plaintiff established his prima facie case while expressing doubt whether a nine-year age gap was sufficient).

Skybridge articulates legitimate, nondiscriminatory reasons for selecting Whitmore over Aulick for the CTO position and for ultimately terminating Aulick. Whitmore had experience and qualifications better suited for the CTO position than Aulick. Unlike Aulick, Whitmore had experience with both call center and fulfillment businesses. Aulick had experience with a fulfillment business only, and that business accounted for less than a quarter of Skybridge's overall business. And the decision to eliminate Aulick's position was based on an independent audit recommending the centralization of Skybridge's IT departments. Thus, Aulick's position as IT director of fulfillment became superfluous.

The burden now shifts back to Aulick to show these reasons offered by Skybridge are, in fact, pretext for age discrimination. To meet this burden, "[a] plaintiff may show that the employer's explanation is unworthy of credence because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a prohibited reason more likely motivated the employer." Torgerson, 643 F.3d at 1047 (internal quotation marks omitted).

Aulick argues that Skybridge's inability to identify who made the decision to terminate him amounts to pretext. "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." Kobrin v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir. 1994). As Aulick correctly points out, Skybridge and its executives have given varying and contradictory statements as to who fired him. In their deposition testimonies, both Cattoor and Morris claimed Whitmore made the decision to terminate Aulick. But Whitmore testified that he had

nothing to do with the decision. Cattoor and Morris subsequently submitted declarations explaining that they oversaw the termination decision.

No reasonable juror, however, could infer pretext from these facts because there has been no substantial change in the *reason* given for Aulick's termination. Aulick's argument centers on the issue of who made the decision to terminate him. But the analysis at the pretext stage revolves around why an employment decision was made. See Fitzgerald v. Action, Inc., 521 F.3d 867, 874 (8th Cir. 2008) (finding that "a rational trier of fact could find the employer's varying reasons for the employee's termination are evidence of pretext"). The reasons given for Skybridge's employment decisions concerning Aulick have remained constant.

Skybridge's proffered reasons for hiring Whitmore instead of Aulick are based in undisputed fact and worthy of credence. Whitmore had experience with both call center and fulfillment businesses. Aulick's only experience was with the fulfillment business, which accounted for less than 25% of Skybridge's total business. Aulick counters that his advanced degree and professional certificates made him a more qualified candidate. But "we do no sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." Elam v. Regions Fin. Corp., 601 F.3d 873, 880-81 (8th Cir. 2010) (internal quotation marks omitted).

Nor can Aulick show that age more likely motivated Skybridge's employment decisions. Aulick asserts that Skybridge always intended for Whitmore to receive the CTO position, and so the interview process was predetermined. But Skybridge was not even aware of Whitmore until May 2013, *after* Cattoor first approached Aulick about his interest in the position. Aulick also mentions that Skybridge fired him and three other employees over age 60 in the same general time period. Aulick, in fact, alleges that all Skybridge employees in Minnesota over age 60 were terminated. The record, however, does not support this last allegation. Instead, the record shows that

-11-

Skybridge terminated Aulick's position because of an independent audit and not animus. The record also shows that Morris had hired three new executives over the age of 57 in the two years prior to Aulick's termination, further undercutting any claim of age discrimination.

In his last attempt to show prejudice, Aulick cites our decision in Fisher v. Pharmacia & Upjohn and argues that the conflicting opinions on Aulick's work performance are evidence of pretext. See 225 F.3d 915 (8th Cir. 2000). He directs us to Cattoor's negative view of Aulick's work in the September 2012 memorandum as compared to Cattoor's positive comments to Aulick while encouraging him to stay and apply for the CTO position. In Fisher, we noted that charges of poor performance, when offered as a nondiscriminatory reason for an adverse employment action, may constitute pretext when compared to previously positive performance reviews. See id. at 921. But here, Skybridge has never offered poor performance as a reason for hiring Whitmore or terminating Aulick. As a result, Fisher is inapposite.

Aulick has failed to show a genuine issue of material fact as to pretext. Accordingly, we affirm the district court's grant of summary judgment on the state and federal age discrimination claims in favor of Skybridge.

III.

Aulick's two remaining claims assert that Skybridge made misrepresentations to him resulting in his present and allegedly perpetual state of unemployment. The two claims are fraud (intentional misrepresentation) and negligent misrepresentation. The elements of intentional misrepresentation in Minnesota are that a defendant:

> (1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing

-12-

whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation.

M.H. v. Caritas Family Servs., 488 N.W.2d 282, 289 (Minn. 1992).

To succeed on a negligent misrepresentation claim, a plaintiff must establish "(1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information." Williams v. Smith, 820 N.W.2d 807, 815 (Minn. 2012).

Under either misrepresentation claim, the plaintiff must show that the defendant in fact made a false representation. Aulick submits three false representations Skybridge supposedly made to him.

First, Aulick alleges that Skybridge "duped him into staying with a false promise of promotion to CTO." Skybridge, however, made no such promise. Indeed, Aulick himself admits that Cattoor told him that he was not guaranteed the CTO position. Aulick also had personal knowledge that at least one other person (Brady) had been offered the position, that the position had been posted externally, and that he was one of two names to be submitted to Morris for the job. Further, no discussion of start dates or salary ever took place. At his deposition, Aulick testified that Cattoor's positive comments made Aulick think "there's a good chance of me getting this job." However, as the district court correctly noted, a "good chance" of getting a job differs greatly from a promise of that job.

Second, Aulick asserts that Skybridge misrepresented his standing in the application process. Aulick cites Cattoor's September 2012 memorandum as

-13-

evidence that Skybridge had already decided Aulick was not a candidate for the CTO position. In that 2012 memo, Cattoor reported that Aulick was not capable of leading IT projects and that Skybridge should explore alternatives for IT management. So, Aulick continues, Skybridge falsely misrepresented his standing in the application process when Cattoor told Aulick "the job is yours to lose" and that "you've got the inside track."

Viewed in the light most favorable to Aulick, the factual record fails to show any misrepresentation of Aulick's position in the application process. The 2012 memo ended with a call for Skybridge "to continue working with [Aulick] to overcome his shortcomings." And both Cattoor and Morris denied that any decision about Aulick and the management of IT had been reached at the time of the memo. The Brady audit later identified Aulick as the only in-house candidate for the job. Whitmore was not known to Skybridge before May 2013, which undercuts a claim that the application process was rigged from the start. Even as Whitmore entered the application process, "Aulick was still in the mix" for the CTO position. Aulick received an extensive, two-hour interview in which his resume and accomplishments were discussed. Thus, significant evidence contradicts Aulick's assertion that he was never actually considered for the CTO position. Only speculation supports Aulick on this point, and "we need not accept unreasonable inferences or sheer speculation as fact." See Gilani v. Matthews, 843 F.3d 342, 349 (8th Cir. 2016) (internal quotation marks omitted).

Third, Aulick argues that Skybridge misrepresented his position with the company. According to Aulick, Skybridge induced him into staying after Whitmore was hired by promising that his recommendations for updating IT infrastructure would finally be implemented. Aulick directs us to comments made by Morris after Aulick's presentation at a June company meeting calling for a new warehouse management system. Morris stated after the presentation both in person and via email

-14-

that he was eager to start on the proposed project. Aulick claims these statements were false because the project was never undertaken.

No reasonable juror could conclude that Skybridge falsely misrepresented Aulick's position with the company for two reasons. First, as the district court explained, it would be unreasonable to infer that Morris intentionally encouraged Aulick to remain at Skybridge as late as July 8th while planning to terminate Aulick just a week later. Cf. Piekarski v. Home Owners Sav. Bank, F.S.B., 956 F.2d 1484, 1494 (8th Cir. 1992) ("It is highly unlikely that Donley would encourage Piekarski to continue his employment at Home Owners when he wanted to fire him."). Second, the fact that the project never happened is insufficient evidence that the representation made to Aulick was fraudulent. See Rognlien v. Carter, 443 N.W.2d 217, 220-21 (Minn. Ct. App. 1989) ("A representation or expectation as to future events is not a sufficient basis to support an action for fraud merely because the represented act did not take place.").

In short, Aulick has failed to present evidence that Skybridge made any false representations to him. To be sure, executives at Skybridge strongly encouraged him to apply for the position. They emphatically stated he had a good chance at getting the position. They also expressed relief that he had stopped his job search. But, unquestionably, no one at Skybridge ever asked him to stop his job search. No one promised him the position. In fact, Cattoor expressly told him he was not guaranteed the position.

Were we to find that Skybridge made a false misrepresentation, Aulick nonetheless could not show justifiable reliance on that misrepresentation. Aulick, an at-will employee, never had a job offer from a potential employer. "[W]here an at-will employee merely continues to work and does not claim to have turned down any offers of employment based upon an employer's representations, no reliance will be

-15-

found." <u>Hanks v. Hubbard Broad., Inc.</u>, 493 N.W.2d 302, 309 (Minn. Ct. App. 1992). Thus Aulick's misrepresentation claims fail as a matter of law.

## IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Skybridge.

_____